**Mary I. HAYES, et al., Plaintiffs,**

**v.**

**Dong S. CHA, M.D., Defendant.**

**Civil No. 00–1101(JBS).**

United States District Court,
D. New Jersey,
Camden Vicinage.

Sept. 29, 2004.

Frank D. Allen, Esquire, Patrick M. Flynn, Esquire, Archer & Greiner, P.C., Haddonfield, NJ, for Plaintiffs Mary and Edward Hayes.

Louis J. Dughi, Jr., Esquire, Robert W. Donnelly, Jr., Esquire, Dughi, Hewit & Palatucci, P.C., Marlton, NJ, for Defendant Dong S. Cha, M.D.

## OPINION

ROSEN, United States Magistrate Judge.

## I. INTRODUCTION

Presently before the court is the defendant's motion for a new trial or in the alternative for remittitur pursuant to Fed. R.Civ.P. 59(a). Also before the court is the plaintiffs' motion to amend the judgment order to include prejudgment interest pursuant to Fed.R.Civ.P. 59(e). The court has rarely witnessed a suit fraught with such complexity, both factual and procedural, as was the medical malpractice suit brought by Mary I. Hayes and her husband, Edward J. Hayes. The complexity derived in part from the difficulty in diagnosing Mrs. Hayes's malady, a diagnosis which was not obtained until nearly two years following the suit's inception. The case chronicled an odyssey of epic proportions borne principally by the Hayes: the lengths to which Mr. and Mrs. Hayes went to discover the source of Mrs. Hayes's injury and the suffering that she and her husband endured throughout the litigation and into today and tomorrow. The jury was apprised of the Hayes's travails and awarded them $20 million in compensation for their suffering. The validity of the jury's finding and the propriety of that award, as well as certain of this court's evidentiary rulings, are at issue in the instant motions.

After having carefully considered the submissions of the parties, the trial testimony, and the relevant jurisprudence, the court shall deny the defendant's motion for a new trial on liability, grant in part the defendant's motion for a remittitur, remitting the verdict from $15 million dollars to $10 million dollars in favor of Mrs. Hayes, and from $5 million dollars to $1 million dollars in favor of Mr. Hayes, and grant in part the plaintiffs' motion for prejudgment interest. Should the plaintiffs not accept the court's remittitur, the court shall grant in part the defendant's motion for a new trial and order a new trial on damages only.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On March 7, 2000, Edward and Mary Hayes filed suit against Dr. Dong S. Cha alleging that Dr. Cha committed medical malpractice and failed to supply Mary Hayes with sufficient information to constitute informed consent in connection with the full face-lift plastic surgery performed on Mary Hayes on September 22, 1995. Mr. Hayes asserted a loss of consortium claim. Jurisdiction was based on diversity of citizenship. The trial in the above matter occurred on December 1–5 and 8, 2003 and the instant motions followed. The parties briefed the issues through April 2004. The defendant objects to the verdict and asserts that a new trial is warranted on several grounds: (1) that the overwhelming weight of the evidence negates any reasonable finding of causation between the 1995 surgery and the October 2001 diagnosis of mycobacterium fortuitum; (2) that the plaintiffs failed to carry their burden on informed consent; (3) that the court erred by allowing cross-examination of Dr. Cha with a $50 check which had not been produced in discovery, by allowing cross-examination of Dr. Cha with sterilization standards promulgated

in 1998, and by allowing the plaintiffs to exploit the court's ruling regarding the defendant's motion in limine to preclude reference to Dr. Cha's two-month active suspension; and (4) that the jury award shocks the conscience requiring, at the very least, a new trial on damages or a remittitur. The plaintiffs oppose the defendant's motion, asserting that the jury's verdict was reasonable both on liability and on damages. The plaintiffs further maintain that the court did not commit error during the trial. These arguments require a complete review of the evidence presented to the jury.

Beginning with the opening statement through the closing, the plaintiffs delivered a focused and complete explanation of Mrs. Hayes's injury. The plaintiffs called Mr. Hayes as their first witness. Mr. Hayes's testimony outlined the entire theory of the plaintiffs' case. He was a very credible witness, who observed not only his wife's illness during the course of their day-to-day life, but who attended nearly every one of his wife's doctor appointments with her during the critical period. Mr. Hayes spoke about their life together and how it has changed since the surgery. He also spoke knowledgeably about the development of his wife's illness, their search for the cause, the myriad doctors and diagnoses and treatments, the final accurate diagnosis of mycobacterium fortuitum, and the treatment of that illness.

Mr. Hayes, a lawyer who splits his practice between general corporate representation and professional baseball player representation, testified about the Hayes's life before the surgery:

> Our life was good at the time. Her health was good. We had a very active life. We vacationed generally twice a year. We would travel to Florida in March each year for my—for the baseball portion of my practice to meet with clientele in Florida. My wife would host a party for the players and their parents at Christmas time each year, we always thought it was a good idea for them to get together with one another, for parents to speak to one another. We would host a picnic every year, it used to be called the Hayes Annual Picnic on the Fourth of July where we would have people over. Go out to dinner regularly. Although I'm not a big gambler, we made it a habit of going to the casino to see a show or gamble once a month. We were both very, very active. She at the time was very active with painting and sculpting. After she had stopped working, she had returned to the Moore College of Art and Design for art, which was something that she always wanted to do. So, we had a very active life.

(T. 219:7–25). This testimony was corroborated by two of the Hayes's family friends, Denise Manto and Orlando Terry Anderson. Ms. Manto, a good friend of the Hayes and the wife of one of the baseball players whom Mr. Hayes represents, testified that Mary was the life of the party, very social, an artist, and very instrumental in getting the local players and their families together and in supporting them. (T. 411–412, 415). Mr. Anderson indicated that he was Mary's best friend, and that before the surgery they would see each other, either singly or with their spouses, socially about once a week. He also described Mrs. Hayes as the life of the party. (T. 420).

Mr. Hayes also testified about his wife's health problems before the surgery, which he described as minimal: "I mean, there was the problem going through the change where she had discomfort, hot flashes. She had some acne that came about the same time as the hot flashes. She had some rheumatoid arthritis in the past that was particularly evident in her hand, her

fingers, her knuckles had swollen that made painting difficult for a while. But generally, both of us, thank God, were healthy." (T. 220:1–9).

Mr. Hayes further testified about Mrs. Hayes's September 22, 1995, surgery by Dr. Cha, all of which testimony Mrs. Hayes corroborated on the record. On the date, given the extensive nature of the full face-lift surgery, Mrs. Hayes was nervous. Indeed, Dr. Cha had prescribed valium for her to calm her nerves before the surgery. Mr. Hayes recalled that Mrs. Hayes did not want to have to wait at the doctor's office for the surgery to begin, so they were scheduled as the first surgery, early in the morning, "eight or nine o'clock." (T. 220:15–19). Mrs. Hayes was not, however, the first surgery performed that day. Upon arrival, the Hayes were told that there was an emergency liposuction and they would have to wait. (T. 221:13–16). Mrs. Hayes was not taken in for surgery until around 11:30 or 12 noon. (T. 221:18–21).

According to Dr. Cha's testimony, his usual practice is to meet with the patient before the surgery, but Mr. Hayes testified that Dr. Cha did not meet with the Hayes before the surgery that morning. (T. 221:22–222:1). During the surgery, however, Dr. Cha or his anesthetist (Mr. Hayes was not certain which), came to Mr. Hayes and explained that during the course of the surgery, the doctor had "noticed a growth" on Mrs. Hayes's nose: "[E]ither Dr. Cha or his anesthetist came out and said that the doctor during the course of the surgery had noticed a growth on the bridge of my wife's nose, that he was convinced it was cancerous and that he wanted to remove it as part of this process, but that he could not do it without consent. And obviously, since my wife was anesthetized at the time, she couldn't give the consent, would I give the consent. I

mean, I was shocked to be told that my wife had cancer on her nose and said absolutely, do what you need to do to take it off." (T 222:7–16). Later tests revealed that the growth was not cancerous. (T. 222:18–19).

After the surgery, Mr. Hayes testified, he attended several of his wife's post-operative appointments with Dr. Cha. Mr. Hayes further testified that "[s]hortly after the surgery, she developed a redness along the left jawline." (T. 223:12–13). He also recalled an appointment on October 31, 1995, where his wife had a complaint about her earlobe being swollen and red. Mr. Hayes testified that he attended one more appointment after the October 31 appointment and that "[t]here was redness in the jaw" and "lumps under her neck." (T. 223–24). Dr. Cha stated that such redness and swelling was not unusual, and he prescribed a cream, which he sold to Mrs. Hayes. Mr. Hayes testified that his wife returned to Dr. Cha several times after this last visit that Mr. Hayes attended. (T. 224).

Mr. Hayes testified that his wife would ask him periodically to feel the lumps in her skin, but Mr. Hayes did not want to do it because the skin appeared sore, "it was almost like a brush burn." (T. 224:22–23). Several months after the surgery, a lump "opened as a small sore, and it was different in my mind than what she had been experiencing with the change with a pimple, this was a sore. And it wouldn't bleed, it would drain, they were small, and then over time it would close up." (T. 224:23–225:3). Mr. Hayes testified that the lumps and sores would rise and open throughout 1996. Mrs. Hayes could almost plan the timing of the development and opening of the sores. They started out in the area of her chin, and then spread around her face, finally involving her chin, neck, cheeks, nose, and forehead.

During 1996 and early 1997, Mr. Hayes was not concerned because the lumps and sores were small and they would drain and close. Moreover, Mrs. Hayes's estrogen prescription was changing, and the lumps and sores were then attributed to the estrogen and her menopause. (T. 225–26).

Mr. Hayes began to be alarmed, however, in the summer of 1997. At that time, the sores started getting larger. (T. 226). Mr. and Mrs. Hayes went to see their family doctor, Dr. Glickman, who said it was "the worst thing he had ever seen," confirming Mr. Hayes's concerns. (T. 226). Dr. Glickman referred them to Dr. Abraham, whom they consulted in August 1997. (T. 227:10). Both Dr. Abraham and Dr. Farber, whom Mrs. Hayes consulted once in 1996, diagnosed her with acne and prescribed antibiotic creams to put on the wounds. (T. 227:12–15).

Between 1997 and 1998, Mrs. Hayes treated with several doctors, all with Mr. Hayes's involvement and participation. They visited Dr. Bondi three times with three different diagnoses: rosacea, then combination of rosacea and acne, then infected hair follicles. Mr. Hayes "really didn't have a lot of comfort." (T. 228:4–5). Then were then referred (through a baseball team doctor) to Dr. Hurley, whom they consulted twice. Dr. Hurley blamed Mr. Hayes for his wife's malady, indicating that Mr. Hayes was "stressing his wife out" and that "[he] was causing it." (T. 228:17–18). Mr. Hayes described how he cried after being blamed for his wife's medical problem. After Dr. Hurley, the Hayes returned to Dr. Milgraum, the physician who had performed Mrs. Hayes's eyelid surgery in 1994. He diagnosed her with rosacea.

The next notable event in the Hayes's lives was the spring training trip to Florida in March 1998. The day before they were to leave for the trip, a sore on Mrs. Hayes's cheek opened up and expelled a small piece of green wire that resembled fishing wire. This was extremely frightening for the Hayes's and painful for Mrs. Hayes. Mr. Hayes dropped the wire off at Dr. Glickman's office, and the couple left for the Florida trip the following day. The Hayes offered a photograph of this sore into evidence, which the Hayes testified they took only so that Dr. Glickman would be able to observe the wound before it healed, as they were in Florida and believed it could close before they returned from their trip. Mr. Hayes described not only Mrs. Hayes's agony on this trip, but her seclusion from the usual events with the baseball players and their wives. (T. 229–31).

Because Mrs. Hayes was still not getting relief from her problem, Dr. Glickman referred them next to Dr. Manstein at Jean's Hospital, with whom they consulted twice. Dr. Manstein performed the first biopsy the results of which were inconclusive—Dr. Manstein suggested that Mrs. Hayes's sores were cause either by a herpetic condition or possibly by suture abscess. (T. 232).

Finally, in 1999 during a gynecological appointment, Mrs. Hayes had some open wounds and the gynecologist recommended another doctor, Dr. Krause. The Hayes's first appointment with Dr. Krause was in August 1999. Dr. Krause believed that the cause of Mrs. Hayes's condition could be silicon that had been injected in her face and was causing the eruptions, but that cutting open her face would not reveal the silicon. Thus, Dr. Krause started interlesional injections. (T. 233). Mr. Hayes testified that for up to a year, "on a regular basis, sometimes weekly, my wife would be taken back into his operating area, sedated, and he would inject her face with needles to try to break up what he believed at that point in time was silicon,

at the same time he was doing some biopsies and sending them out for chemical analysis to try to find the presence of silicon." (T. 233:23–234:3). This intensive treatment had a radical effect on their lives:

> Our life had changed dramatically by that point in time. We did not go out, she both did not like her appearance during that period of time, also had open wounds through a good part of that time, and didn't want to be seen, quite frankly, out. She did not go out much herself to do things that she had done before, little things like food shopping, little things like cooking, which my wife had done before, she was not doing during this period of time. I mean, she was sick.

(T. 234:20–235:2).

In 2000, Mrs. Hayes started to complain that she felt strangled by the lumps under her neck, which had continued to be present throughout the progression of her condition. She was at that point admitted to the hospital, and Dr. Krause cut her neck open and pulled the skin down and removed "granuloma." (T. 236:4). She received some relief from the pain in her neck during that period of time. Dr. Krause performed many surgical procedures. (T. 236). Before the diagnosis of mycobacterium fortuitum, he would sometimes relieve the pressure in her face by inserting tubes into her face and allowing the sores to drain. Mr. Hayes described one sore in particular that opened almost down to her cheek bone and was wide enough to insert a quarter. To relieve the pain of this sore, Dr. Krause hospitalized Mrs. Hayes and inserted a tube through the hole and out through the back of Mrs. Hayes's ear to allow the sore to drain.

The jurors observed a photograph of this particular sore, along with several other photographs depicting Mrs. Hayes's condition at different times over the past several years.

In June 2001, the Hayes traveled to the Mayo Clinic, in Rochester, Minnesota, where they consulted with many specialists. One of the specialists suggested that Mrs. Hayes had caused these sores through self-mutilation. Notably, one specialist, whom Dr. Krause later confirmed was the infectious disease specialist, opined that the sores looked like some kind of mycobacterium.[1] (T. 327). The doctors at the Mayo Clinic could not do a test because Mrs. Hayes was on antibiotics, and it was Mr. Hayes's understanding that antibiotics mask the presence of mycobacterium. (T. 237). This understanding was later corroborated by the plaintiffs' expert witnesses. (*See e.g.* Dr. Kirby, T. 327–328; Dr. Huitt T. 372–75).

The Hayes's doctors ultimately discovered mycobacterium fortuitum in October 2001 during a biopsy taken when Mrs. Hayes was hospitalized for the quarter-sized sore. Dr. Krause then referred the Hayes to Dr. Rausch. At that point, the doctors tested the bacteria for resistance and established that there were three therapeutic drugs that could work on Mrs. Hayes's particular strain of mycobacterium fortuitum. Treatment was started using two of them, Amikacin and Cipro. The Amikacin, a highly toxic antibiotic, requires intravenous injection; thus doctors inserted a "portacath" in her chest. Amazingly to the Hayes, within one week of starting the medications, all the sores on Mrs. Hayes's face started to close. That was unlike any of the other antibiotic

---

1. Mrs. Hayes's ultimate diagnosis was of infection from mycobacterium fortuitum, which disease is fully described *infra,* at 485.

treatments Mrs. Hayes had undergone in the past years. The treatment lasted approximately forty-three days of three-hour injections each day. Mr. Hayes would begin the treatment in the morning before he went to work. The medications caused severe nausea and lethargy. Mrs. Hayes took Phenergan for the nausea. It was Mr. Hayes's understanding that Amikacin could cause deafness, so the doctors tested her hearing regularly. Mr. Hayes testified that when the doctors noted a loss in hearing, they took her off of the Amikacin and finished the first round of antibiotics with Cipro and Rifampin. These were both oral drugs, taken twice daily. She finished out the first round of antibiotics and had about a two-month hiatus with no sores.

The sores returned after two months; the Hayes had been told that this could occur and, indeed, would probably occur. The doctors told the Hayes that they would know the disease had been cured when the sores did not return. That had not yet happened by the time of trial. The Cipro and Rifampin were resumed, in the spring of 2002, and Mrs. Hayes was treated for another several months. The wounds again closed as a result of the second round of treatment. The doctors observed her for a few months and, when the sores did not return, they took out the portacath.

The sores returned again, but this time after approximately four or five months. Mr. Hayes took this as progress. But the disease had not yet been cured. Mrs. Hayes started again on the Cipro and Rifampin, but this time the sores did not heal, indicating that the bacteria had become immune to one or both of these treatments. There was only one medicine left that would be effective against her bacteria, as revealed in the early resistance testing: Imipenem (or Pramoxine).

She was put on Pramoxine and Rifampin. Pramoxine was another intravenous drug, so Mrs. Hayes had to have a pick line inserted in her arm. The medicine required infusions two times per day for a half-hour. This antibiotic gave Mrs. Hayes sweats, clamminess, and nausea, but the nausea wore off after about a half-hour. Prior to trial, Mrs. Hayes began developing pain in her arm. The doctors did not detect swelling, which could be evidence of blood clot formation, but did an ultrasound to be safe. The ultrasound revealed both a blood clot and a fibrous flap over the pick line, and Mrs. Hayes was immediately sent into emergency surgery. What the Hayes believed would be an overnight stay turned into a seven-day hospital stay. After the surgery, Mrs. Hayes continued the antibiotic treatment. This was the regimen that Mrs. Hayes was following at the time of trial.

In addition to the antibiotic treatment, after the mycobacterium diagnosis, the doctors also treated Mrs. Hayes's sores with "debridement." Debridement is a medical surgical procedure in which the doctor would cut out all of the skin that appeared infected. (T. 236). Also, at a certain point after the diagnosis, Dr. Krause began to attempt a repair of Mrs. Hayes's face, to insert something to replace the part of her face that had been eaten away. Mr. Hayes could not even count the number of surgeries that his wife underwent, there were so many.

Mr. Hayes then described their lives today:

> She is still very lethargic, she's tired most of the time. Obviously, we have a clock, she's got a regiment at 6:30 in the morning and she's got a regiment at 7:30 at night. Our life presently consists of visiting doctors once a week. She still does not like the way she looks, so we do not socialize. We have not vacationed in

482

years. We've cancelled the spring training trip the last few years. We have not had the Hayes Family Picnic for the last couple of years. Her arthritis continues to give her a problem, so if she's down on the floor with my grandson, I often find myself helping her get up. I do the shopping, I do most of the stuff that needs to be done. While she's gotten better considerably from this, we still have a way to go.... [Our life is] completely the opposite. My wife, who was as outgoing a person as I've ever seen, who loved to socialize, who loved to entertain, who was the life of the party, is now a recluse. She lives in our house. Other than my son's wedding and just recently our granddaughter's christening, she is not out of the house other than doctor visits. And what we try to do is we take my grandson with us on the doctor visits because we stop at the Cherry Hill Mall on the way back from the doctors, because that's her one time out of the house. So, we spend an hour or two in the Cherry Hill Mall. I'm sorry. That's our social life.

(T. 256:2–257:2). The testimony of the Hayes's friends, Mr. Anderson and Ms. Manto, added that Mr. Hayes should be canonized for the way that he has supported and cared for Mrs. Hayes throughout this ordeal. (*See e.g.* T. 421:12).

The plaintiffs' pictoral presentation was no less consistent or compelling. It is said that a picture is worth a thousand words; it would be hard to articulate words sufficient to replace the force of the pictures entered into evidence in this case. The Hayes's and their friends' description of the Hayes's hermit-like retreat from society was quite credible, upon reviewing these pictures. The oozing, large sores reinforced the witnesses's testimony that Mrs. Hayes's appearance was aesthetically unpleasant and that forays away from the home could possibly put Mrs. Hayes in danger of additional infection from wind or rain or sun exposure entering through the wounds. Among the pictures, the plaintiffs submitted as an exhibit a picture of the quarter-size wound that fully corroborated both Mr. and Mrs. Hayes's description of the physical pain that Mrs. Hayes endured, as well as its vast difference from any kind of pimple. Mrs. Hayes herself also provided evidence of the ordeal she has endured and continues to endure. The jurors could observe first-hand the ravages of the disease, which Mrs. Hayes may never defeat.

That testimony became the foundation of the plaintiffs' case, and no fact or expert witness refuted any of the above information. Even the defendant's experts did not refute the above information; rather, they merely attempted to sever the tie between Mrs. Hayes's complaints beginning just after the surgery and the actual diagnosis of mycobacterium fortuitum in October 2001. The balance of the plaintiffs' witnesses verified, expanded, and corroborated Mr. Hayes's testimony.

Mary Hayes took the stand and testified very compellingly and convincingly about the development of her disease, including the pain that she has experienced since the surgery, her diagnosis and treatment, and the change her life has undergone since the surgery. Among the facts highlighted by her testimony concerned the plaintiffs' informed consent claim. Mrs. Hayes testified that she initially consulted Dr. Cha to fix sagging in her neck. She did not want anything else done. But Dr. Cha advocated for more surgery—in fact, the entire face lift along with more work on her eyes. She testified that he convinced her to get the full face lift. She further testified that he did not discuss the risk of infection, nor did the booklets explaining the procedure mention infection as a risk of the surgery.

Following the surgery, Mrs. Hayes testified that she visited Dr. Cha several times, including two or three visits after the October 31 visit. She complained about the swelling and redness at those visits, but Dr. Cha told her that such swelling and redness was usual and it would go down over time. She further confirmed that Dr. Cha had sold her over-the-counter creams for the swelling.

Dr. Krause also corroborated and elaborated upon Mr. Hayes's foundation. Dr. Krause testified that he began seeing Mrs. Hayes on August 9, 1999. At that time, she had multiple scars on her chin, forehead, and neck, and open abscesses in some of these areas. (T. 271:4–13). Dr. Krause testified that he had never seen anything like it before. (T. 271:21–22). Initially, he thought that she might have been injected with liquid silicon, had trouble with the silicon, and began to develop granulomas, but he had only seen such infections in pictures. (T. 272:1–4). His first course of treatment involved applying Cordran tape, a cortisone tape that comes in a roll, to the sore areas of her face. That "seemed to give her some relief." (T. 272:9). Thus, he then "embarked on a course of injecting her face with cortisone itself," mixed with novocaine to relieve the pain of the shot, approximately every two weeks. (T. 272:9–13, 273:18). These injections continued from "1999 well into 2001." (T. 272:15). Because Mrs. Hayes complained of intense pain during the injections, Dr. Krause gave her intravenous sedation and pain relief during each session. (T. 273:19–22). Dr. Krause further testified that although she seemed to get some relief, Dr. Krause did not feel that he was treating the cause of the problem. Thus, on several occasions he took a biopsy of her skin. Those early biopsies showed that there was a foreign body, but not what it was.

Dr. Krause also pursued other avenues for discovering the source of the infection, including sending the tissue to colleagues and to institutions. Dr. Krause arranged the Mayo Clinic visit in 2001 because he had been told that a specialist practiced there who had the ability to chemically analyze whether or not silicon was present in Mrs. Hayes's face. (T. 275). The Mayo Clinic was disappointing not only for Mr. and Mrs. Hayes, but also for Dr. Krause. Just as Mr. Hayes had earlier testified, Dr. Krause also testified that one of the doctors who saw Mrs. Hayes accused her of self-mutilation. Although Dr. Krause could not see how someone could cause the types of sores that he had been seeing, but also not wanting to dismiss a specialist's diagnosis, Dr. Krause testified that he had a frank discussion with the Hayes about self-mutilation. They emphatically denied it to him and he continued to look for alternatives, specifically the possibility that it was a bacterial infection. Dr. Krause testified that he took Mrs. Hayes to get a biopsy and some cultures. This time, the culture was retained and monitored by the lab for two full weeks. The immediate report did not show any organism, but a few days later, something began to grow. A few days after that, the lab reported that a mycobacterium had grown out in the culture. And finally, after two full weeks, the lab confirmed that it was mycobacterium fortuitum. (T. 276).

Dr. Krause testified that, at the time of trial, his prognosis was "guarded": "I think I have to be sure that her disease is quiet for a significantly long period of time before I can try to do anything to help her further with her facial appearance. What I'm hoping is that eventually I can go in and operate on her and add some tissue in the form of either her own tissue or some other tissue to restore the depressions and scars and things like that all over her face." (T. 279:24–280:5). The scarring oc-

curs because "[t]his particular bacteria tunnels through the cutaneous tissue, that's the fat between the skin and the muscle, and it destroys that tissue. And then the skin sinks in and compresses down against the muscle and results in a scar." (T. 280:7–10).

Dr. Krause opined about Dr. Cha and his adherence to the standard of care required for plastic surgical procedures. Dr. Krause confirmed unequivocally that, to a reasonable degree of medical certainty, Dr. Cha had deviated from the required standard of care and that the deviation caused Mrs. Hayes to contract the bacterial infection. (T. 280:14–23). Dr. Krause indicated that Dr. Cha had not only done a "standard face-lift" but also performed some liposuction, and that "the bacteria was most likely introduced by the liposuction instruments" and that "they were probably not properly sterilized ahead of time." (T. 281:1–16). This testimony was reinforced by the Hayes's prior testimony that Dr. Cha had performed an "emergency liposuction" just prior to Mrs. Hayes's scheduled surgery, and by the multiple subsequent witnesses who testified, including Dr. Cha himself, that Dr. Cha did not follow required sterilization procedures. These procedures include: (i) wrapping the instruments in tape that is heat-sensitized to change color if the sterilization process was properly completed; (ii) utilizing indicator strips that are placed within the Autoclave [2] itself; and (iii) sending certain material to outside facilities once a month to assess the Autoclave's effectiveness. Dr. Krause himself had inspected Dr. Cha's ambulatory surgical facility and the Autoclave, in the early 1990's as an inspector for an organization called the "quad A PSF, [the American Association of Ambulatory Office Facilities for Plastic Surgery] an organization that inspects ambulatory plastic surgery facilities." (T. 282:19–20, 304:20–23). At the time of Dr. Krause's inspection in the early 1990's, the appropriate sterilization records were present. At the time of Mrs. Hayes's operation, the appropriate records were no longer present, the testing was no longer regularly performed.

Dr. Krause opined that the liposuction instruments—canulas—were the most likely source of the infection because they require a difficult and time-consuming sterilization process including scrubbing the instruments with special brushes and then running the instruments through the Autoclave. Moreover, Dr. Krause indicated that he had seen reports in medical literature that infections were being caused by these liposuction canulas, and the infections were of the mycobacterium variety. (T. 283).

Dr. Kirby, an expert in microbiology and pathology, who did a two-year research fellowship at Tufts Medical School studying bacteria and bacterial pathogens, further corroborated the earlier testimony. (T. 310). Dr. Kirby testified that he personally operates an Autoclave in his research laboratory to sterilize his equipment. (T. 311). He reiterated the sterilization process outlined by Dr. Krause and then opined that to a reasonable degree of medical certainty that the disease was caused either by a failure in the sterilization practices or in the Autoclave itself. (T. 311–314). Dr. Kirby confirmed the

2. Autoclaves are machines used by ambulatory surgical facilities to sterilize instruments: You may remember those, you probably have seen those in some of the medical movies or TV shows that you've seen, they used to look like kind of like a barrel and a front that would open and these actually— they look a little more boxy now, but they actually use steam and very high temperatures to sterilize all the instruments.
(T. 207:19–24 (Def.'s Opening Statement)).

plaintiffs' theory by summarizing the early development of Mrs. Hayes's illness, based on his review of the depositions and medical records. (T. 315:18–25). Dr. Kirby further confirmed the plaintiffs' witnesses's testimony that there was no evidence that Mrs. Hayes had received injections from her doctors between the time of her face-lift surgery by Dr. Cha and the time she treated with Dr. Abraham in September 1997. (T. 316).

Dr. Kirby described the pathology of mycobacterium fortuitum:

> Yeah. Well, they call this organism rapidly growing mycobacterium, but actually there is—it's not that rapid in the grand scheme of things, it neither grows rapidly nor does it cause a very rapid infection. When we often think of infection, we think of something like a typical surgical infection, you become symptomatic within days of your surgery and it becomes very acute, it brings you to the doctor right away and you get treated. Rapidly growing microbacterium are . . . It's rapid comparing to slow-growing microbacterium. . . . Those would be things like the bacteria that causes tuberculosis, that's call microbacterium tuberculosis. There are a number of other slow-growing microbacterium, too. I guess there is mycobacterium lepri, which can['t] even be grown in the laboratory, so that's a very slow-growing microbacterium. . . . [U]nlike a typical bacterial infection, rapidly-growing microbacterium can take quite some time before symptoms first appeared. And so I think they—in reviewing the literature, they say the median time is about one month after surgery, for example, when the organism was introduced, but it can actually be—or after some sort of trauma was introduced, the organism, but it can actually be quite long. . . . I've seen reports of two years, three years. There is actually even a report of some-

> one who I think stepped on a toothpick and it lodged in his foot and I think about 15 years later developed mycobacterium fortuitum infection. And so it can be—it's a very unusual type of infection and it can be quite a long time between the initiating event and when the symptoms occur. And as you might imagine, it could be very confusing for doctors to try to sort out. You know, they're not necessarily thinking about this organism in relationship to some of that that a patient might have had.

(T. 317:11–319:6). As far as the clinical course of these mycobacterial infections, Dr. Kirby testified that "they tend to be chronic. Patients will, once their symptoms first start to appear, well, there is a very lucky small minority who just get better, but unfortunately, most of the people develop very chronic sores, they'll develop ulcers, abscesses, these lesions which kind of come and go, but basically they'll—infection will essentially persist indefinitely unless some sort of therapy is given. So, it's a chronic progressive infection." (T. 319:9–17). As for treatment, Dr. Kirby testified that "[t]he treatment would be antibiotics. And one of the significant things about treating these organisms is that they require prolonged treatment, courses of six months of therapy. And that's what Mrs. Hayes had, I think she's had an initial six month course of therapy. And sometimes even with what we think is adequate therapy, these infections aren't completely cured and patients may have to be treated again. And it might—therapy alone might not be sufficient and especially with infections that are sort of widespread that involve tissue deeply, you often need to do surgery too in order to help get rid of the infection. It's a very difficult infection to deal with." (T. 319:19–320:5). Dr. Kirby also testified about the origin of the infection in Mrs. Hayes:

Q. Is there any significance to the fact that these sores, ulcers are only located on her face?

A. There is significance to that. In terms of—in reviewing the case matter and trying to figure out how this infection came to be, I made note of the fact that she's (sic) actually has lesions which have developed on many areas of her face, so it's not just a lesion on her right cheek or a lesion on her left cheek, she has had lesions on both cheeks, under her jawline, on multiple areas of her face. And to me, that suggests that there has to be some sort of unifying event where this organism was introduced all at once into multiple locations. And my conclusion, to a reasonable degree of medical certainty, is that unifying event, based upon the time of the development of these lesions, was her original plastic surgery.

(T. 320:6–20).

Dr. Kirby further discussed the pathology of Mrs. Hayes's disease, as revealed by her medical records at different points. He noted that her biopsy in 1998 revealed chronic inflammation and that this would be typical in a mycobacterial infection, but that the acid-fast stain that would have revealed the mycobacterial infection itself was not done at this time. (T. 322–323). He further noted that the biopsy in 1999 of certain of her neck lymph nodes revealed hyperplasia, which is consistent with an infection and consistent with a mycobacterial infection. (T. 323–324). The biopsy further revealed granulomas composed of histiosities, some of which were multi-nucleated, again consistent with mycobacterial infection. (T. 325). But though these bodily defenses could bespeak a mycobacterial infection, which both sides' experts assert is a very rare occurrence, the doctors initially were focused on the more common possibility, the foreign-body infec-

tion. (*See e.g.* T. 326–327). Moreover, it is very difficult to find mycobacterium, even if you are looking for it: it only shows up in 30 percent of the properly performed cultures, the cultures must be specifically for mycobacterium as they are held much longer than regular bacterial cultures, and if the patient is on antibiotic medication then the chances of discovery are greatly decreased. (*See e.g.* T. 329–332).

During direct testimony, Dr. Kirby also refuted the defendant's experts' opinions based on their reports. For example, Dr. Kirby disagreed with Dr. Sanchez's conclusion that the pathology was not consistent with mycobacterial infection. (T. 332–334). Dr. Sanchez opined in his report, and later testified at trial, that the descriptions of the pathology findings, which include foreign body, giant cells, fibrosis and chronic inflammation, are not features of mycobacterium. Dr. Kirby specifically disagreed with this conclusion noting that in his experience, the "foreign body giant cells are found almost always with these types of infections." (T. 334:15–20). Dr. Kirby further opined that a granuloma-type response would be primary evidence of a mycobacterial infection and the more advanced polymorphonuclear leukocytes would not have to be present for a mycobacterium fortuitum infection to exist. (T. 333).

Finally, the plaintiffs presented Dr. Huitt, Director of the Adult Infectious Disease Care Unit at the National Jewish Medical and Research Center, board-certified in internal medicine and infectious disease. (T. 368). The facility in which she practices is a national and international referral center for the treatment of mycobacterial infections, along with several other disease processes. Her particular specialty is in mycobacteria and infectious diseases, the area in which she practices and teaches, and the center sees roughly

between five hundred and a thousand patients per year with mycobacterial infections. Ninety-seven percent of the patients she personally sees clinically have mycobacterial infections. (T. 369). Dr. Rausch contacted the National Jewish Medical and Research Center on its consult line initially, and Dr. Huitt advised Dr. Rausch on the course of treatment for Mrs. Hayes. (T. 371).

Dr. Huitt testified that Mrs. Hayes's medical history is "extremely characteristic" of mycobacterial infection. (T. 372). For example, the characteristic time course for the pain and redness to develop into a sore and then break open is a few weeks to a few months. That is precisely the course described by Mrs. Hayes. (T. 372). Dr. Huitt further testified that a variety of commonly used antibiotics essentially put the bacteria to sleep, euphemistically speaking. (T. 374–375). Steroid injections can cause two polar reactions: either the infection will quiet down and the pain will subside for a time or the infection will flare up and the pain will worsen. (T. 375). Dr. Huitt agreed with the other witnesses that the pathology reports of the samples are consistent with mycobacterial infection. (T. 376).

Dr. Huitt also discussed the difficulty in diagnosing this disease and, in particular, the delay that often accompanies the diagnosis of the disease. Dr. Huitt even went so far as to opine that she would rather have tuberculosis because of the difficulties in not just diagnosing, but also treating the mycobacterium fortuitum. (T. 376). As physicians, they are taught to look for the common infections first—"not the zebras" as it were—and mycobacterium fortuitum is a zebra. (T. 376–377). Dr. Huitt further testified that this bacteria has an association with surgery. (T. 377). Dr. Huitt also opined that to more than a reasonable degree of medical certainty Mrs. Hayes was infected during the surgery: "In my review of the records, it seems extremely likely, highly probable that this infection occurred during the surgical procedure because of the manifest—the appearance of the characteristic swelling and redness and pain on the skin within several weeks to a couple of months after the surgical procedure." (T. 377:15–20).

Dr. Huitt further opined that to a reasonable degree of medical certainty Dr. Cha deviated from accepted medical practice in his care and treatment of Mrs. Hayes. (T. 377–378). First, there was a deviation in the doctor's common practice that he only perform one surgery a day, and instead he performed two. Second, no proper record-keeping existed for the sterilization protocol. Third, Dr. Cha did not prepare a post-operative report of the surgery. The standard of care requires that a "specific operative report indicating what type of surgical procedure was done, where were the surgical incisions performed, what instruments were used, how was the—how was the incision or the—the incision, how was it closed, and what with." (T. 378). "Finally, the records allude to the patient complaining of a lump in the neck and a swelling of the earlobe and pain in the earlobe and this was not followed up. And within the time period that this was seen in this type of operative procedure, it certainly is standard of care to follow up much sooner than a month's time when a patient is reporting some type of swelling and pain in an area after the surgery." (T. 379:2–10). This would indicate an infectious process beginning. (Id.).

As an alternative to this detailed and corroborated medical and personal chronology, the defendant offered the theory that the time was too attenuated for the surgery to have been the source. Dr. Cha's testimony, however, did not aid the

defendant in either the informed consent case or the medical malpractice case. By his own admission, Dr. Cha did not inform Mrs. Hayes of the risk of infection. Counsel for the plaintiff read into the record the following testimony from Dr. Cha's deposition, that Dr. Cha did not later dispute:

Q: But what risks and complications and consequences did you tell this patient that she could, you know, experience as a result of this surgery? A: Well, that is written on the consultation note the day of surgery. Q: Okay. So, you read the note in. So, it is your testimony that the only risks that she was advised of are those that are documented in ... the note of August 22, 1995 ... ? A: Yes.

(T. 354:11–20). The risks and complications and consequences that Dr. Cha discussed with Mrs. Hayes are documented in the note on the day of the surgery. Dr. Cha's notes discussing the risks read: "she will get numbness on cheeks and ear that will take several months to go away. If facial nerve is severed, she will get crooked face. She could get pulled, I guess it's lower lid, if too much skin taken out. She will get back to us." (T. 423:18–22). At trial, Dr. Cha confirmed that testimony. (T. 513:11–514:20). As for his sterilization procedures, Dr. Cha confirmed that he did not keep regular records of his autoclaving (T. 522) and that he did not use indicator strips on the instruments every time he autoclaved an instrument (T. 524).

The defendants offered three expert witnesses. The first, Dr. Sanchez, was board-certified in anatomical and clinical pathology with a specialty of cellular pathology. (T. 547–548). From 1975 to 2001 he lectured at NYU School of Medicine on myco-bacterial disease and granulomatosis. (T. 549). After reviewing the medical reports, pathology report, and pathology slides, Dr. Sanchez opined that "the mycobacterial changes were present in the biopsies from 2001, but none in any of the biopsies before that date." (T. 552). Dr. Sanchez did not go farther than this on direct examination. This opinion does not negate the plaintiffs' testimony that the initial biopsies did not have the proper follow-up to find mycobacterial disease.

Dr. Sanchez further commented on the pathology reports. He indicated that granulomas are present when mycobacteria are present (T. 554), that antibiotics will not destroy the granulomas, but may cloak or destroy the bacteria, and that there were no granulomas present on the slides. (T. 555). Dr. Sanchez opined that as of October 2001, the granulomas were present and that meant that mycobacterium fortuitum was present, but that the prior slides showed only inflammation and foreign body infection that were not indicative of mycobacterium fortuitum. (T. 557–562). Despite this testimony, Dr. Sanchez confirmed that the slides in 1999 showed lymph granulomas and scar tissue, but he opined that this did not indicate mycobacterium fortuitum. (T. 562–63). He noted that the medical records show in 1998 a squamous acanthosis in the scar tissue from the abscesses, but, he opined, this did not indicate mycobacterium fortuitum. (T. 563). On cross-examination, Dr. Sanchez agreed that there were only two cultures done. He conceded that the first culture, done in the summer of 2001, was thrown out in two days, and that two days is not sufficient for mycobacterium to grow in a culture. (T. 570). Sanchez's opinion is that Mrs. Hayes contracted the mycobacterial infection between August and October of 2001. (T. 571). Dr. Sanchez did not offer a diagnosis for what the underlying problem was prior to October 2001 when the mycobacteria was found, nor did he offer an explanation for Mrs. Hayes's problems prior to that time.

Dr. Burstin, board-certified in infectious disease and internal medicine, trained at NYU Medical School, trained in infectious disease at Harvard Medical School and Peter Brigham Hospital. (T. 602). Two of his publications are on mycobacterium tuberculosis. (T. 604). While he was a practicing physician, he saw on average four to five cases of "mycobacterial bacterial infections" a year. (T. 605). However, all but one of these patients had pulmonary mycobacterial infections; Dr. Burstin had only seen one patient in his career with a skin mycobacterial infection. (T. 634).

Dr. Burstin opined that mycobacterium tuberculosis, which causes pulmonary infection, is the most common mycobacterium in this part of the world; the other types are "very rare." (T. 605). "Mycobacterium fortuitum is seen almost everywhere; it's in water, it's in soil, and it very rarely causes infection. . . . [T]he infections that it does cause are of two types, pulmonary infection, which is unrelated to this case, and usually is in patients who are immune-compromised, and skin infections often after surgery." (T. 606:20–607:1). Thus, Dr. Burstin confirmed the plaintiffs' experts' testimony that mycobacterium fortuitum occurs most often when there has been a surgical procedure. Dr. Burstin highlighted the following about mycobacterium fortuitum infection:

> But one of the things that's very important to know in the case where it presents later, and it has occurred after certain surgical proceedings, it starts as a lump underneath the skin. And if you look at the timing to the event where it presents, so this is taking a look at all the studies, and I can give you a list and I'll give some examples, it occurs always within three months in 99 percent of the patients. . . . So, these patients go to the doctor, usually with one or two little lumps under the skin within three months and mostly within two months of the surgical procedure. So on the time line, you have to remember lump under the skin, two months, becomes an abscess and drains. Then if nothing is done, it may spread a little bit locally right where the surgery was. So that the timing is very important.

(T. 607:23–608:14). This description mirrors the plaintiffs' and their friends' description of the development of Mrs. Hayes's disease.

Dr. Burstin opined that the most likely source of Mrs. Hayes's infection was from the biopsy performed by Dr. Krause in July 2001. (T. 626). He notes that three months after that biopsy, mycobacterium fortuitum was found in the October 2001 biopsy. Dr. Burstin suggested that nothing was known about the preparations for the biopsy in July 2001. (T. 614; 615). Up until that point, all the studies were "non-specific" and all indications were that the sores were merely acne from Mrs. Hayes's hormonal changes. (T. 614–615; 624–26). Dr. Burstin agreed with Dr. Huitt that during the time that Mrs. Hayes was on antibiotic therapy, the disease would have been partially controlled. But, Dr. Burstin maintained that the earlier diagnoses of acne and rosacea were accurate and that in 2001 the mycobacterium fortuitum was introduced during the procedures performed on Mrs. Hayes's face. (T. 624–26). This testimony does not take into account or explain the multiple diagnoses that did not include acne and rosacea in that earlier time period, including the Mayo Clinic infectious disease specialist who opined that it may be a mycobacterial infection (T. 633), or the acute and chronic inflammation diagnoses.

On cross-examination, Dr. Burstin agreed that the first lesion may not have drained by the end of the first three months, and an open sore may not have

formed at that time. The disease could have stayed as abscesses under the skin. (T. 627–28).

Dr. Burstin opined about sterilization techniques and, upon questioning from plaintiffs' counsel, he indicated that it would be a deviation of the standard of care if a practice did not use the strips every time they cleaned instruments. He further opined that although there was a debate about using the strips in the seventies and eighties, the debate has been resolved and the strips are to be used every time. (T. 640). Thus, Dr. Burstin testified that, in his opinion, Dr. Cha's practices deviated from the standard of care for plastic surgery.

Finally, the defendant offered Dr. D'Amico, trained in internal medicine with a specialization in plastic and reconstructive surgery. Dr. D'Amico has been in private practice for twenty years with the majority of his practice focused on facial plastic and reconstructive surgery. He is board-certified by the American Society of Plastic Surgeons, where he sits on the board of trustees, and is also a member of the faculty at Mount Sinai Medical Center in New York City. (T. 657). Dr. D'Amico spoke about the intricacies of being an accredited surgical facility. (T. 664). He opined that if there was a problem with the Autoclave and its sterilization efficacy, many patients would be contracting infections. (T. 668–669). Dr. D'Amico also opined that at the time of the surgery, in the mid-nineties, the standard for sterilizing instruments in an Autoclave included keeping a log of Autoclave usage, using an indicator each time an instrument is sterilized, and sending out spore samples once a month. (T. 681–82). Thus, Dr. D'Amico's testimony also confirmed that Dr. Cha's practices did not meet the standard of care.

Dr. D'Amico provided a detailed explanation of the typical face-lift surgery (T. 669–673). Among his comments, Dr. D'Amico opined that lumpiness, as noted in Dr. Cha's October 1, 1995 office visit note, is common following such surgery. (T. 673). Dr. D'Amico opined that the mycobacteria could not skip from the cheek or the chin to the forehead. (T. 675). But, he explained that Dr. Cha could have performed his surgery of the fat removal around the eye either by making an incision under the eye or by entering through the eyelid. Dr. D'Amico admitted that he could not tell from Dr. Cha's post-operative notes which method he chose because the notes omitted such details. (T. 678). Moreover, Dr. D'Amico's knowledge of the bacteria was from research that he conducted from medical literature after he was retained to be an expert in this case. Prior to being retained, he had never seen a mycobacterial infection, nor were any of his colleagues to whom he spoke familiar with the infection. (T. 684).

Finally, Dr. D'Amico confirmed that the medical literature that he reviewed indicated that the pathology of mycobacterium fortuitum may either be granulomatous tissue or chronic inflammation. (T. 687). Dr. D'Amico noted that often surgeons used cortisone injections "to treat an inflammatory process to try to get the inflammation to quiet down." (T. 676:19–20). And Dr. D'Amico admitted that Mrs. Hayes had been given cortisone injections. Although defense counsel's point was to highlight that the cortisone itself could contain the bacteria, Dr. D'Amico's comments support the plaintiffs' theory that an inflammatory process was already present when the shots began.

As for the informed consent claim, Dr. D'Amico admitted that while his consent form does not specifically mention infection as a risk, it is one of the risks that he discusses with his patients. (T. 679). He further testified that he considers it his

duty to explain such risks of infection to his patients. (T. 681). Dr. Cha's own testimony confirms that he did not discuss the risks of infection with Mrs. Hayes. Thus, Dr. D'Amico's testimony provides further support for the plaintiffs' theory that Dr. Cha breached the standard of care for informed consent.

Following the testimony, the jury returned a verdict for the plaintiffs on both claims and awarded Mrs. Hayes $15 million and Mr. Hayes $5 million.

In addition to the defendant's motion for a new trial, the plaintiffs filed a motion to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e) and New Jersey Court Rule 4:42–11(b), by adding $3,672,190 to the judgment for prejudgment interest. The defendant opposes the motion asserting that the state rule allowing prejudgment interest does not apply in federal court and that there is no federal rule providing for prejudgment interest. The defendant further maintains that 28 U.S.C. § 1961 governs, as it addresses the issue of interest while not providing for prejudgment interest. In the alternative, the defendant asserts that even should the court apply the state rule, no prejudgment interest should be assessed as this case falls within the realm of "exceptional cases" in which no such interest accrues. The defendant further asserts that the plaintiffs were the cause of the delay in bringing the case to trial. The plaintiffs assert that the state rule does apply, that the defendant has not shown extraordinary circumstances prohibiting allocation of prejudgment interest, and that any delay in bringing the action can be attributed to the defendant.

## III. DISCUSSION

### A. STANDARD ON A MOTION FOR NEW TRIAL

Federal Rule of Civil Procedure 59 provides in pertinent part:

A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States[.]

Motions for a new trial in diversity cases, long considered to be within the exclusive purview of federal jurisprudence, *see e.g. Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 84 (3d Cir.1960), *Johnson v. Parrish*, 827 F.2d 988, 991 (4th Cir.1987), were pulled into the vortex of the substantive/procedural dichotomy by the Supreme Court's decision in *Gasperini v. Center for the Humanities, Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). In *Gasperini,* the Court considered whether both the trial court and the appellate court should apply a New York state standard when reviewing the size of jury verdicts on a motion for a new trial in a diversity case. In New York, prior to *Gasperini,* federal common law developed a "shocks the conscience" standard: "courts would not disturb an award unless the amount was so exorbitant that it 'shocked the conscience of the court.' " *Gasperini,* 518 U.S. at 422, 116 S.Ct. 2211. State courts applied the same standard pursuant to state common law until the New York legislature enacted a statutory standard for judicial review of jury awards in 1986. *Id.* at 423, 116 S.Ct. 2211. That standard required appellate courts to determine whether jury awards, upheld by trial courts, "deviate[ ] materially from what would be reasonable compensation." *Gasperini,* 518 U.S. at 423, 116 S.Ct. 2211 (citing CPLR § 5501(c)). New York state courts had held that the "deviates materially" standard requires closer

scrutiny of jury verdicts than does the "shocks the conscience" standard. 518 U.S. at 424, 116 S.Ct. 2211. And New York state courts had applied that statute to trial courts, despite the statutory language referring only to appellate courts. *Id.* at 425, 116 S.Ct. 2211.

The lower court in *Gasperini* applied the federal common law "shocks the conscience" test to the jury award upon a Rule 59 motion following trial. The Court of Appeals applied the state standard, set aside the verdict, and ordered a remittitur and a new trial if the plaintiff did not accept the remittitur. The Supreme Court framed the question as one of conflict between the New York statute setting a standard for review of jury awards by both the trial and appellate courts and the Seventh Amendment's "Re-examination Clause" prescribing that "no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." 518 U.S. at 418, 116 S.Ct. 2211. The Court resolved the conflict by holding that "New York's law controlling compensation awards for excessiveness or inadequacy can be given effect, without detriment to the Seventh Amendment, if the review standard set out in [the New York law] is applied by the federal trial court judge, with appellate control of the trial court's ruling limited to review for 'abuse of discretion.'" *Gasperini,* 518 U.S. at 419, 116 S.Ct. 2211.

While the holding of *Gasperini* is not complex to articulate, placed as it is at the beginning of the opinion, its import is difficult to discern. The Court spent a considerable portion of the opinion discussing its conclusion related to the appellate courts and their application of federal law when reviewing trial court determinations; however, its discussion relevant to a district court's review of motions for a new trial in diversity cases is relegated principally to a few seemingly contradictory paragraphs and one notable, though conclusory, footnote, none of which fully illustrate the standard from which the Court's conclusion was drawn.[3]

The Court in *Gasperini* did not review federal trial courts' past practice of relying on federal common law when deciding motions for new trial in diversity cases—a practice that the Supreme Court appeared to confirm in the 1989 decision *Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). In *Browning–Ferris,* the parties asked the Court to consider whether an award of punitive damages in a diversity case was excessive as a matter of federal common law. The Court rejected that framing of the question and explained that "[i]n a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law. *Federal law, however, will control on those issues involving the proper review of the jury award by a federal district court and court of appeals.*" 492 U.S. at 278–79, 109 S.Ct. 2909 (emphasis supplied). The Court then unanimously held: "In reviewing an award of punitive damages, the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, *by reference to federal standards developed under Rule 59,* whether a new trial or remittitur

**3.** For a thorough analysis and critique of *Gasperini, see* Freer, *Some Thoughts on the State of Erie after Gasperini,* 76 Tex. L.Rev. 1637 (1998); *see also* Wright & Miller, 20 Fed. Prac. & Proc. Deskbook § 62 (citing Freer's article with approval).

should be ordered." 492 U.S. at 279, 109 S.Ct. 2909 (emphasis supplied).[4]

This *Browning–Ferris* rule evolved to allow for a body of federal common law to develop in the context of motions for new trial typified by that applied by the trial court in *Gasperini.* Several courts since *Gasperini* have continued to apply the dictates of *Browning–Ferris* to motions for a new trial. But, as Justice Scalia noted in his dissent to *Gasperini,* the Court silently overruled that decision with respect to its description of the role of substantive state law in federal courts' review of jury awards. Confusingly, the *Gasperini* Court cites the very same language from *Browning–Ferris* to which some courts, *see e.g. Schaefer v. Spider Staging Corp.,* 275 F.3d 735, 738 (8th Cir.2002), have referred for the rule that federal law continues to govern whether a new trial or remittitur should be ordered. *Gasperini,* 518 U.S. at 435, 116 S.Ct. 2211. Yet, the *Gasperini* Court, when responding to Justice Scalia's remarks that federal law should continue to apply to motions for a new trial, rejects federal common law as the rule in such cases:

> Justice Scalia finds in Federal Rule of Civil Procedure 59 a "federal standard" for new trial motions in " 'direct collision' " with, and " 'leaving no room for the operation of,' " a state law like CPLR § 5501(c). [518 U.S. at 468, 116 S.Ct.] at 2239 (quoting *Burlington Northern R. Co. [v. Woods],* 480 U.S. [1], at 4–5, 107 S.Ct. [967], at 969[, 94 L.Ed.2d 1]). The relevant prescription, Rule 59(a), has remained unchanged since the adoption of the Federal Rules by this Court in 1937. 302 U.S. 783. Rule 59(a) is as encompassing as it is uncontroversial. It is indeed "Horn-

book" law that a most usual ground for a Rule 59 motion is that "the damages are excessive." *See* C. Wright, Law of Federal Courts 676–677 (5th ed.1994). Whether damages are excessive for the claim-in-suit must be governed by *some law.* And there is no candidate for that governance other than the law that gives rise to the claim for relief—here, the law of New York. See 28 U.S.C. §§ 2072(a) and (b) ("Supreme Court shall have the power to prescribe general rules of . . . procedure"; "[s]uch rules shall not abridge, enlarge or modify any substantive right"); *Browning–Ferris,* 492 U.S., at 279, 109 S.Ct., at 2922 ("standard of 'excessiveness' " is a "matte[r] of state, and not federal, common law"); *see also* R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 729–730 (4th ed.1996) (observing that Court "has continued since [*Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965),] to interpret the federal rules to avoid conflict with important state regulatory policies," citing *Walker v. Armco Steel Corp.,* 446 U.S. 740, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980)).

*Gasperini,* 518 U.S. at 437 n. 22, 116 S.Ct. 2211. In this statement, particularly as Justice Scalia couched it, the Court seems to repudiate any application of such federal common law standards as the "shocks the conscience" standard to diversity cases, regardless of the substantive nature of the damages law. Viewed alone, the footnote presents the position that Rule 59 does not conflict with the Rules Enabling Act's proscription against abridging, enlarging, or modifying any substantive right, and that there is not even a candidate for governance of the question of whether damages

---

4. Notably, the Court expanded this statement in *Gasperini* to include questions concerning compensatory damages as well as punitive damages, thus making the standard applicable to the instant case. 518 U.S. at 435 n. 18, 116 S.Ct. 2211.

are excessive. Of course, this statement seems to beg the question of why, then, federal courts had long applied federal common law standards such as the "shocks the conscience" standard to motions for new trial in diversity cases.

In the context of the opinion as a whole, however, the *Gasperini* Court has taken the inquiry of whether state law or federal law applies to motions for a new trial in diversity cases out of the Rules Enabling Act's purview, 28 U.S.C. § 2072, and placed it squarely within the *Erie* and Rules Decision Act[5] maelstrom, 28 U.S.C. § 1652.[6] At least one court has so interpreted *Gasperini*. *See Mejias–Quiros v. Maxxam Property Corp.*, 108 F.3d 425, 427 n. 1 (1st Cir.1997). In *Mejias–Quiros*, the court was asked to apply Puerto Rican law to a motion for a new trial in a medical malpractice case. In a brief and perfunctory footnote, the court cited a Supreme Court of Puerto Rico case for the proposition that the damages law in Puerto Rico does not impose a cap, and thus is not substantive. *Id.* ("If local law placed a substantive cap on medical damages, it would control, [citing *Gasperini*], but Puerto Rico case law suggest no such departure from ordinary practice [citing *Gonzalez v. Ponce Cement Corp.*, 98 D.P.R. 201, 213, 1969 WL 21543 (1969) ].".). While the simplicity of the First Circuit's approach holds much appeal—finding that a state standard would apply only if it imposed an award cap—it does not account for the fact that *Gasperini* did not involve a state statute which placed a cap on damages. *Gasperini*, 518 U.S. at 428–29, 116 S.Ct. 2211. The Court performed a full *Erie*/Rules Decision Act analysis to reach its decision.

The RDA, as originally interpreted by *Erie*, requires that federal courts apply state substantive law and federal procedural law. *See Gasperini*, 518 U.S. at 427, 116 S.Ct. 2211. This pithy concept has generated no end of jurisprudential consternation. *See* Wright & Miller, 20 Fed. Prac. & Proc. Deskbook § 62; *Gasperini*, 518 U.S. at 427, 116 S.Ct. 2211 (describing the classification as "a challenging endeavor"). The *Gasperini* Court summarized the standard by reference to the "outcome-determination" test of *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), as tempered by the "twin aims of *Erie*," as characterized by *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965):

> *Guarantee[Guaranty] Trust* [ ], an early interpretation of *Erie*, propounded an "outcome-determinative" test: "[D]oes it significantly affect the result of a litigation for a federal court to disregard a

**5.** The Rules Decision Act provides: "The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." 28 U.S.C. § 1652.

**6.** This conclusion is further buttressed by Justice Stevens's dissent, which expresses a similar position: "Because there is no conceivable conflict between Federal Rule of Civil Procedure 59 and the application of the New York damages limit, the case is controlled by *Erie* and the Rules of Decision Act, rather than by the Rules Enabling Act's limitation on federal procedural rules that conflict with state substantive rights." *Gasperini*, 518 U.S. at 440 n. 1, 116 S.Ct. 2211. Justice Stevens further remarks, "The Rule does state that new trials may be granted 'for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States,' but that hardly constitutes a command that federal courts must always substitute federal limits on the size of judgment for those set by the several States in cases founded upon state-law causes of action. Even at the time of the Rule's adoption, federal courts were bound to apply state statutory law in such cases." *Id.*

law of a State that would be controlling in an action upon the same claim by the same parties in a State court?" 326 U.S. at 109[, 65 S.Ct. 1464]. Ordering application of a state statute of limitations to an equity proceeding in federal court, the Court said in *Guarantee[Guaranty] Trust:* [W]here a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Ibid.* (citation omitted). A later pathmarking case, qualifying *Guarantee[Guaranty] Trust,* explained that the "outcome-determination" test must not be applied mechanically to sweep in all manner of variation; instead, its application must be guided by "the twin aims of the *Erie* rule: discouragement of forumshopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer,* 380 U.S. 460, 468[, 85 S.Ct. 1136, 14 L.Ed.2d 8] (1965).

*Gasperini,* 518 U.S. at 427–28, 116 S.Ct. 2211. The Court then reformulated the query *Hanna* posed as follows, "Would application of the standard have so important an effect upon the fortunes of one or both of the litigants that failure to apply it would unfairly discriminate against citizens of the forum State, or be likely to cause a plaintiff to choose the federal court?" *Gasperini,* 518 U.S. at 428, 116 S.Ct. 2211 (internal edits omitted). The Court then

applied this reformulated test to the New York statute. The Court noted that if the state rule included a statutory cap, it would certainly be substantive, and thus govern. The Court found that even though the New York statute imposed only a standard of review of jury awards, that standard "was designed to provide an analogous control" as a statutory cap.[7] The Court reviewed the legislative history and noted that the New York legislature enacted the statute to "foster predictability" and to reign in excessive damages awards. *See Gasperini,* 518 U.S. at 430–31, 116 S.Ct. 2211. The Court held that the statute's objective was "manifestly substantive," and concluded that "[j]ust as the *Erie* principle precludes a federal court from giving a state-created claim 'longerlife . . . than [the claim] would have had in the state court,' *Ragan [v. Merchants Transfer & Warehouse Co.],* 337 U.S. [530,] 533–34, 69 S.Ct. 1233, 93 L.Ed. 1520 [(1949)] . . ., so *Erie* precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court." 518 U.S. at 430–31, 116 S.Ct. 2211.

Following this analysis, the Court reviewed Rule 59's scope vis-a-vis trial court review. The Court noted that a trial court's authority to grant a new trial is "large," particularly in the context of the Seventh Amendment's lack of an expressed limit on that authority. *Gasperini,* 518 U.S. at 432–433, 116 S.Ct. 2211. The Court described that authority histori-

---

**7.** The New York statute in question, CPLR § 5501(c) provides:

> The appellate division shall review questions of law and questions of fact on an appeal from a judgment or order of a court of original instance and on an appeal from an order of the supreme court, a county court or an appellate term determining an appeal. In reviewing a money judgment in an action in which an itemized verdict is

> required by rule forty-one hundred eleven of this chapter in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

cally as including the power to grant a new trial where it "clearly appears that the jury ha[s] committed a gross error, or ha[s] acted from improper motives, or ha[s] given damages excessive in relation to the person or the injury," or "if the verdict appears to [the judge] to be against the weight of the evidence." *Gasperini,* 518 U.S. at 433, 116 S.Ct. 2211 (citing *Blunt v. Little,* 3 F. Cas. 760, 761–62 (C.C.Mass.1822, No. 1,578) (Story, J.), and *Byrd v. Blue Ridge Rural Elec. Cooperative, Inc.,* 356 U.S. 525, 540, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958) respectively). The Court stated that the authority includes not only the power to overturn a verdict for excessiveness but also to order a new trial "without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini,* 518 U.S. at 433, 116 S.Ct. 2211.

■ In summary, *Gasperini* parses the trial court's role in motions for new trial pursuant to Rule 59 by bifurcating the traditional Rule 59 standard into a "procedural" element and a "substantive" element. The "procedural" element is that which provides the breadth of the court's authority, i.e. the traditional bases for granting a motion for new trial: (1) where the verdict is against the weight of the evidence, (2) where the verdict is excessive, (3) where the jury has acted from improper motives, (4) where the jury has committed a gross error.[8] The "substan-

tive" element is the legal standard by which a court assesses each of those bases.[9] And trial courts perform the *Erie* analysis when determining whether the substantive element of the Rule is governed by federal or state law in any diversity case. Rule 59 does not run afoul of the Rules Enabling Act here because, in the Court's final analysis, the traditional Rule 59 standard only properly includes the procedural element. The substantive element that courts have developed over time, e.g. the "shocks the conscience" test, is not, under *Gasperini,* formally a part of Rule 59's scope. This formulation of the Rule 59 standard allows for a consistent reading of both *Browning–Ferris* and *Gasperini.*

## B. APPLICABLE LAW

■ The question before the court is then whether New Jersey has a law (or rule or standard) applicable to any of the bases for a new trial and, if so, would "application of the standard have so important an effect upon the fortunes of one or both of the litigants that failure to apply it would unfairly discriminate against citizens of the forum State, or be likely to cause a plaintiff to choose the federal court?" *Gasperini,* 518 U.S. at 428, 116 S.Ct. 2211.

■ New Jersey Court Rule 4:49–1 governs new trials in New Jersey and provides in relevant part:

**8.** Perhaps notably absent from this list as a basis for a new trial is judicial error. This concept, however, is encompassed in the notion of the jury having committed gross error. Also notable is the Third Circuit's recognition of each of these bases. *See e.g. Lind v. Schenley Indus., Inc.,* 278 F.2d 79 (3d Cir.1960) (en banc).

**9.** The term "substantive" is used here in a broad sense, meaning that it is this aspect of a court's traditional analysis in motions for new trial that is subject to the *Erie* choice of law

review. The substantive classification does not suggest that each of these bases for granting a new trial requires application of state law. Rather, the classification signifies that each of these bases for granting a new trial is given meaning, form, and, indeed, substance through some body of law, whether state or federal, and the *Erie* review will guide courts in deciding which forum's law should apply to any particular basis for granting a new trial.

A new trial may be granted to all or any of the parties and as to all or part of the issues on motion made to the trial judge.... The trial judge shall grant the motion if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law. R. 4:49–1(a). In applying that standard, New Jersey courts "emphasize that a jury verdict should not be disturbed 'unless it constitutes a manifest injustice that shocks the judicial conscience.'" *Mahoney v. Podolnick,* 168 N.J. 202, 229, 773 A.2d 1102 (2001) (citing *Carey v. Lovett,* 132 N.J. 44, 66, 622 A.2d 1279 (1993)). This standard is very nearly identical to the federal standard which recognizes that "a new trial should only be granted where 'a miscarriage of justice would result if the verdict were to stand,' the verdict 'cries out to be overturned,' or where the verdict 'shocks our conscience.'" *Price v. Delaware Dept. of Correction,* 40 F.Supp.2d 544, 550 (D.Del.1999) (citing *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1353 (3d

Cir.1991)). Application of the federal standard over the state standard where the two are identical does not implicate *Erie's* "twin aims" of "discouragement of forumshopping and avoidance of inequitable administration of the laws," *Hanna,* 380 U.S. at 468, 85 S.Ct. 1136, as application of a federal standard would not govern the choice of a forum nor would it affect the outcome of the case, thus producing inequitable administration of the laws. *Gasperini,* 518 U.S. at 428, 116 S.Ct. 2211. Additionally, unlike the New York statute, New Jersey Court Rule 4:49–1(a) was not enacted as an "endeavor[ ] ... to control compensatory damages for excessiveness." *Gasperini,* 518 U.S. at 431 n. 12, 116 S.Ct. 2211. The rule does not mention damages, and is more a general rule acknowledging the authority of New Jersey courts to order new trials, much like the federal rule. As the federal and New Jersey rules have similar intent, and the standards developed under these rules are virtually identical, this court shall apply the federal standard when reviewing the jury award, and not displace it with the state standard.[10] *Gasperini,* 518 U.S. at 429–31, 116 S.Ct.

---

**10.** There is one significant difference between New Jersey and federal law related to motions for a new trial. New Jersey permits both additur and remittitur and federal law permits only remittitur. *See Fertile v. St. Michael's Medical Center,* 169 N.J. 481, 491, 779 A.2d 1078 (2001), and *Gasperini,* 518 U.S. at 433, 116 S.Ct. 2211, respectively. Additur is "[t]he power of a court, on motion for a new trial due to inadequate damages rendered by jury verdict, to require the defendant to consent to an increase to a stipulated amount of the award as a condition for denial of the motion for a new trial[.]" S.T. Rayburn, *Statutory Authorization of Additur and Remittitur,* 43 Miss. L.J. 107 (1972). Remittitur "describes the power of a court upon a motion for a new trial due to excessive damages rendered by a jury to require the plaintiff to consent to a decrease in the award as a condition for denial of the motion." *Id.* The *Gasperini* Court noted that additur has long been rejected by federal courts as an unconstitu-

tional infringement of the Seventh Amendment right to a jury trial. 518 U.S. at 433, 116 S.Ct. 2211 (citing *Dimick v. Schiedt,* 293 U.S. 474, 486–87, 55 S.Ct. 296, 79 L.Ed. 603 (1935)). The *Dimick* Court opined that allowing additur "is obviously to compel the plaintiff to forego his constitutional right to the verdict of a jury and accept an assessment partly made by a jury which has acted improperly, and partly by a tribunal which has no power to assess." 293 U.S. at 487, 55 S.Ct. 296 (internal quotation omitted). Thus, this difference between the two forum's laws cannot be ground for application of the state's law, as the concept of additur would never be applied in federal court. *To do so* would be to violate an "essential characteristic of the federal court system," *Gasperini,* 518 U.S. at 431, 116 S.Ct. 2211 (citing *Byrd,* 356 U.S. at 537, 78 S.Ct. 893), which is precisely what the Court in *Gasperini* did not allow the Court of Appeals to do.

2211; *Browning–Ferris*, 492 U.S. at 278–79, 109 S.Ct. 2909.

## C. NEW TRIAL: VERDICT AGAINST THE WEIGHT OF THE EVIDENCE

 The defendant's first argued ground for a new trial is that the jury's finding of proximate causation both as to the negligence and the informed consent is against the weight of the evidence. "Motions for new trial are seldom granted, especially when the asserted ground is insufficiency of evidence and the subject matter is not particularly complex and deals with material which is familiar and simple." *Helena Chemical Co. v. Nelson*, 2000 WL 1880331 (D.N.J.2000) (citing *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90–91 (3d Cir.1960)). "The party challenging the verdict—in this case [Dr. Cha]—bears a heavy burden of showing that the verdict is against the weight of the evidence and that 'a miscarriage of justice would result if the verdict were to stand.'" *Id.* (citing *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir.1993)). "[A] new trial should only be granted where 'a miscarriage of justice would result if the verdict were to stand,' the verdict 'cries out to be overturned,' or where the verdict 'shocks our conscience.'" *Price v. Delaware Dept. of Correction*, 40 F.Supp.2d 544, 550 (D.Del.1999) (citing *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir.1991)). "[T]he court is permitted to consider the credibility of witnesses and to weigh the evidence, however the court must 'exercise restraint to avoid usurping the jury's primary function.'" *Blakey v. Continental Airlines, Inc.*, 992 F.Supp. 731, 734 (D.N.J.1998) (citing *Hurley v. Atlantic City Police Dept.*, 933 F.Supp. 396, 403 (D.N.J.1996)).

After fully considering the credibility of the witnesses, and weighing the evidence as described above, the court finds that the jury's verdict is not against the weight of the evidence either on the negligence or the informed consent claim. The defendant's defense, as detailed above, was marked by supposition and conjecture. The defendant did not present a single alternative theory, but many possible theories. Moreover, the defendant's experts agreed with the plaintiff on several important points, in particular that Dr. Cha failed to fulfill his duty by informing the plaintiff of the risk of infection and failed to follow standard sterilization and surgical practices. Indeed, in this court's estimation, the facts overwhelmingly supported the plaintiff on all counts and certainly did not shock the court's conscience.

For example, Dr. Cha attempted to refute the Hayes' and their friends' descriptions of the lumps, redness, and sores developing shortly after the surgery by arguing that Mrs. Hayes did not see many doctors for these complaints between the surgery in September 1995 and the fall of 1997. The Hayes provided an explanation for their conduct, and indeed, supplied evidence that they did see doctors between 1995 and 1997, Dr. Cha among them. According to the plaintiffs, Dr. Cha observed the lumps and redness and told them that it was a usual post-operative experience. The jury was free to reject the defendant's theory. Dr. Cha further attacked Mrs. Hayes's credibility by arguing that she exaggerated the problem post-operatively, just as she had exaggerated the number of dermatologists that she saw between 1995 and 1997. Central to his attacks on Mrs. Hayes's credibility was the reference in Dr. Glickman's and Dr. Hurley's notes that Mrs. Hayes had seen ten dermatologists between 1995 and 1997. At first, the defendant implied that Mrs. Hayes had seen these doctors and that they had injected her with steroid solu-

tion that had caused the mycobacterium fortuitum. However, in counsel's closing, he emphatically asserted that Mrs. Hayes did not see ten dermatologists during that period, but that she was the kind of person who exaggerates her facial problems. The conclusion that the defense urged the jury to draw during closing was that the plaintiff merely had acne that was brought on by her hormonal "change in life" and that she was "picky" about her appearance and so sought medical assistance, that the medical assistance finally included the injections by Dr. Krause in 1999 through 2001 and that those injections caused the infection. Notably, the defendant's experts did not particularly support this theme, as their opinions identified the biopsy in June 2001 as the most likely cause for Mrs. Hayes's infection, and not the injections taking place from 1999–2001. Moreover, neither defense counsel's nor defense experts' explanation addressed the medical problems that Mrs. Hayes described beginning just after the surgery and the severe eruptions in her face that were documented in photographs and in the notes of her treating physicians beginning in late 1997 and 1998. The jury was free to reject these various and contradictory theories for the plaintiffs' cohesive theory fully supported by their experts. The defendant's brief is no more persuasive, relying, as it does, solely on counsel's truncated version of *defendant's* expert testimony. The defendant's brief includes no analysis of the plaintiffs' factual and expert evidence. None of the defendant's explanations provide sufficient basis to reject the jury's determination, which this court finds was fully supported by the evidence.[11]

█ As for the informed consent case, the defendant urges the court to adopt the position that "it is common knowledge that an infection is a risk of every surgical procedure ... [and] the jury would have to find that every facelift, a procedure performed countless times each day throughout the United States, would be declined by any reasonable person to whom the risks were explained." (Def.'s Br. at 18). The defendant misunderstands the legal standard for informed consent.

█ In New Jersey, informed consent "is essentially a negligence concept, predicated on the duty of a physician to disclose to a patient such information as will enable the patient to make an evaluation of the nature of the treatment and of any attendant substantial risks, as well as of available options in the form of alternative therapies." *Largey v. Rothman*, 110 N.J. 204, 208, 540 A.2d 504 (1988) (per curiam). The cause of action sounds fundamentally on "a patient's right of self-determination." *Id.* at 214, 540 A.2d 504. Thus, in *Largey*, the New Jersey Supreme Court adopted the "prudent patient" standard of informed consent as conceived in *Canterbury v. Spence*, 464 F.2d 772 (D.C.Cir.1972), and explained it in the following way:

> The *Canterbury* court announced a duty on the part of a physician to "warn of the dangers lurking in the proposed treatment" and to "impart information [that] the patient has every right to expect," as well as a duty of "reasonable disclosure of the choices with respect to proposed therapy and the dangers inherently and potentially involved." *Id.*

11. The defendant offered another possible explanation that because the mycobacterium is ubiquitous, it could have been contracted any time and any place. But this does not comport with the expert testimony which confirmed that though the bacterium is common, the disease is very rare, nor would such an explanation comport with the jury's own common experience that mycobacteria is very rare.

at 782. The court held that the scope of the duty to disclose must be measured by the patient's need, and that need is the information material to the decision. Thus the test for determining whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked. And to safeguard the patient's interest in achieving his own determination on treatment, the law must itself set the standard for adequate disclosure. [*Id.* at 786–87 (footnotes omitted).] The breadth of the disclosure of the risks legally to be required is measured, under *Canterbury*, by a standard whose scope is "not subjective as to either the physician or the patient," *id.* at 787; rather, "it remains *objective* with due regard for the patient's informational needs and with suitable leeway for the physician's situation." *Ibid.* (emphasis added [by *Largey* court]). A risk would be deemed "material" when a reasonable patient, in what the physician knows or should know to be the patient's position, would be "likely to attach significance to the risk or cluster of risks" in deciding whether to forego the proposed therapy or to submit to it. *Ibid.*

*Largey*, 110 N.J. at 211–212, 540 A.2d 504. As to proximate cause, the court also adopted the *Canterbury* approach, stating that "[u]nder the 'prudent patient' standard 'causation must also be shown: *i.e.,* that the prudent person in the patient's position would have decided differently if adequately informed.'" *Largey*, 110 N.J. at 215, 540 A.2d 504 (citing *Canterbury*, 464 F.2d at 791). The court adopted the "objective" test for this proximate causation standard:

"Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings. And since that testimony would probably be appraised congruently with the factfinder's belief in its reasonableness, the case for a wholly objective standard for passing on causation is strengthened. Such a standard would in any event ease the fact-finding process and better assure the truth as its product."

*Largey*, 110 N.J. at 214–17, 540 A.2d at 510–11 (citing *Canterbury*, 464 F.2d at 791).

██ The defendant urges this court to find that the mere fact that a risk is a matter of "common knowledge" vitiates any informed consent claim because no person could then reasonably claim that they would not have undergone the surgery as everyone who knows of the risk, undergoes the surgery. This turns the standard on its head. The notion of informed consent presupposes that while there is a large group of persons who undergo surgical procedures fully aware of the principal or "material" risks, there is another set of persons who, when informed of these principal risks, would reject the treatment. *See Largey*, 110 N.J. at 211–12, 540 A.2d 504. Informed consent exists as a remedial measure to protect that set of persons who might decline treatment, despite its benefits and the vast number of other persons who successfully complete the treatment. The question for the jury in each case is whether the plaintiff falls within the subset of reasonable people who decline treatment after being informed of the risks. The defendant's fashioning of

the claim, unsupported by legal authority, would deny the existence of such a subset of reasonable people simply because the particular risk in question is a well-known risk. But the notion of self-determination allows for reasonable people to differ regarding what is best for their bodies. *See Largey,* 110 N.J. at 206–09, 540 A.2d at 505–506 ("Every human being of adult years and sound mind has a right to determine what shall be done with his · own body" (quoting Justice Cardozo)). That certain reasonable people agree to treatment despite risks does not preclude other reasonable people from declining such treatment. This is particularly so in a case such as this where the surgery in question is elective and, even more, cosmetic.

■ The defendant's alternative contention that because Mrs. Hayes did not herself testify that she would not have undergone the surgery had she known of the risk again misstates the law. The *Largey* court specifically rejected a subjective standard for proximate causation in an informed consent action. Again adopting the *Canterbury* reasoning, the court opined:

> The shortcoming of this approach, according to *Canterbury,* is that "it places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk."

*Largey,* 110 N.J. at 216, 540 A.2d 504 (citing *Canterbury,* 464 F.2d at 790–91). Thus, Mrs. Hayes's particular testimony as to whether or not she would have undergone the surgery had she been informed of the risk of infection was immaterial to the jury's determination, and the defendant's argument fails.

■ Moreover, testimony concerning Mrs. Hayes describes a person who was nervous about surgery, who originally requested a limited procedure on her neck, and who was convinced by her doctor to have a full face lift performed. It was well within the jury's authority to conclude that a reasonable person in Mrs. Hayes's position would not have consented to the larger operation. This court sees no evidence that would support a finding that the jury's verdict in this regard "shocked the judicial conscience."

The defendant has not met his "heavy burden" of showing that "a miscarriage of justice would result if the verdict were to stand." *Klein v. Hollings,* 992 F.2d 1285, 1290 (3d Cir.1993). The court finds for the above reasons that the verdict was not against the weight of the evidence.

## D. NEW TRIAL: JUDICIAL ERROR

The defendant suggests that the court committed three trial errors that, either individually or cumulatively, were capable of producing an unjust result: (1) admission of a cancelled check to cross-examine Dr. Cha which had not been produced in discovery; (2) admission of 1998 sterilization standards which bore no relevance to the 1995 surgery; and (3) the court's favorable ruling on the defendant's motion in limine concerning Dr. Cha's medical license suspension.

■ Federal Rule of Civil Procedure 61 governs such motions and provides:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by · any of the parties is ground for granting

a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Civ.P. 61. The district court is granted broad latitude "when the reason for interfering with the jury verdict is a ruling on a matter that initially rested within the discretion of the court, e.g. evidentiary rulings, *see Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 187 (3d Cir.1990), ... or prejudicial statements made by counsel[, s]ee *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir.1960)." *Klein v. Hollings*, 992 F.2d 1285, 1289–90 (3d Cir.1993). Thus, under Federal Rule of Civil Procedure 61, the court must determine (1) whether an error was in fact made, and (2) whether the error was so prejudicial that a refusal to grant a new trial would be "inconsistent with substantial justice." Fed.R.Civ.P. 61.

### 1. Cancelled Check

The defendant first asserts that the court erred by admitting a cancelled check, signed by Mrs. Hayes and made out to Dr. Cha, because the check had not been produced in discovery pursuant to Fed.R.Civ.P. 26(a). Essentially, the defendant argues that the plaintiffs violated a standing order of this court, present in Rule 26(a), and thus should not have been permitted to use the check at trial. The defendant does not provide legal support for his argument, other than a passing reference to Rule 26(a)(1) and (3).

▪▪▪ "The exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir.1997) (internal citations omitted). When determining whether such a sanction was required, the court must consider:

(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or other cases in the court, and (4) bad faith or wilfulness in failing to comply with the district court's order.

*Id.* (internal citations omitted).

The first question to be addressed is whether the plaintiffs actually violated a court order, even a standing order appearing in the federal rules. Federal Rule of Civil Procedure 26(a)(1) provides that:

a party must, without awaiting a discovery request, provide to other parties: ... (B) a copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, *unless solely for impeachment.*

Fed.R.Civ.P. 26(a)(1) (emphasis supplied). Federal Rule of Civil Procedure 26(a)(3) includes a similar limitation:

In addition to the disclosures required by Rule 26(a)(1) and (2), a party must provide to other parties and promptly file with the court the following information regarding the evidence that it may present at trial *other than solely for impeachment* [.]

Fed.R.Civ.P. 26(a)(3) (emphasis supplied). These limitations, first appearing in Rule 26 with the 1993 inception of automatic disclosure, were formally incorporated into the 2000 amendments to Rule 26(a), when the Advisory Committee recognized the need and desirability of a nationally uniform practice. Fed.R.Civ.P. 26 2000 amd. Advisory Committee note "Purposes of amendments." The Advisory Committee notes confirm that the change was meant to "narrow" the ambitious scope of the original rule. *See* Fed.R.Civ.P. 26(a)(1) 2000 amd. Advisory Committee note. The Advisory Committee notes further comment that "[s]ubdivision (a)(3) presently excuses pretrial disclosure of information solely for impeachment. Impeachment information is similarly excluded from the initial disclosure requirement [of subdivision (a)(1)(B) ]." *Id.*

The parties did not provide any analysis of these rules or their interpretive jurisprudence, nor has this court found any controlling Third Circuit case law. The courts that have interpreted these rules have recognized their intent, and then both permitted and denied admission of evidence used solely for impeachment and withheld on the basis of the exclusionary language of Rule 26. *Compare Halbasch v. Med–Data, Inc.,* 192 F.R.D. 641 (D.Or. 2000) (admitting evidence offered through cross-examination as impeachment that had not been disclosed in discovery) *with Klonoski v. Mahlab,* 156 F.3d 255 (1st Cir.1998) (precluding evidence offered as impeachment evidence that had not been disclosed in pretrial discovery). Central to these courts' rulings is their interpretation of the word "solely" in 26(a)(3). The First Circuit read solely to mean that the evidence could be used for nothing other than impeachment, that is, that the evidence can have no substantive value. *Klonoski,* 156 F.3d at 270–71. The *Klonoski* court found that the evidence offered as im-

peachment could have been offered in the case-in-chief, thus it violated the broad disclosure requirement, and the failure to disclose constituted misconduct under Rule 60, resulting in a new trial. 156 F.3d at 274–76. *Halbasch* rejected this interpretation, opting instead to follow the reasoning of the Fourth and Seventh Circuits. These circuits had construed "solely" to mean that the evidence itself was offered only as impeachment and not in the offeror's case-in-chief. *Halbasch* 192 F.R.D. at 649 (citing *DeBiasio v. Illinois Cent. R.R,* 52 F.3d 678 (7th Cir.1995), and *Jeffries v. Pacific Indemnity Co.,* 1997 WL 774459 (4th Cir. Dec.17, 1997) (unpublished)). In so holding, the *Halbasch* court voiced its concern that "the First Circuit's approach would result in an erosion of evidence capable of warranting the impeachment designation." 192 F.R.D. at 649. The court explained:

> It is the rare case where an attack on a witness's credibility cannot be linked to some substantive element of a claim. Under *Klonoski,* admission of evidence offered "solely" to impeach would likely be erroneous in almost every case. It is doubtful Congress intended the "solely" exception to swallow the entire impeachment rule.

*Halbasch,* 192 F.R.D. at 649–650. This court shares the *Halbasch* court's concern. However, the court also recognizes that this exclusionary phrase strikes at the heart of the amended rules' broad intent. Automatic disclosure was adopted to end two evils that had threatened civil litigation: expensive and time-consuming pretrial discovery techniques and trial-by-ambush. *See* Fed.R.Civ.P. 26 1993 Advisory Committee notes subd. (a). A too expansive reading of the impeachment exclusion in 26(a) could cause a resurgence of these evils. A too narrow reading could encroach on an attorney's trial preparation,

another important element of the civil system. *See Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). A more balanced reading of the exclusion would take into consideration fairness factors akin to those noted in the *Konstantopoulos* case, namely (1) the prejudice or surprise in fact of the party against whom the information was offered, (2) the ability of that party to cure the prejudice, and (3) the bad faith or wilfulness in withholding the information. In short, the rule should be applied as an aid in the truth-seeking process—the types of concerns extant in a Rule 61 review.

With these principles in mind, the court shall turn to the evidence at issue. The defendant objects to admission of a canceled check. The plaintiffs offered the check to counter the defendant's assertion that he did not sell Mrs. Hayes any cream for the problems that she was having with her face post-operatively. Mrs. Hayes had testified as part of the plaintiffs' direct case that she had visited Dr. Cha's office "a number of times after the operation, usually on a Sunday, to buy a cream that he recommended she put on her face to relieve the swelling, redness, and pain that she was experiencing." (Pl.'s Br. at 20). Dr. Cha denied seeing Mrs. Hayes after October 31, denied having seen her on Sundays, denied her complaints, and denied selling any creams at all to any patients. More specifically, Dr. Cha denied having ever sold creams to Mrs. Hayes because no payments reflecting such a purchase appeared on the "payment card" from his office. (*Id.*). On cross-examination, plaintiffs' counsel elicited the following testimony:

Q. So, Doctor, if you gave someone creams post-operatively, that would not be routine, correct?

A. No, not routine.

Q. And, in fact, you deny that you ever sold Mrs. Hayes any creams post-operatively, correct?

A. To the best my recollection, I didn't sell anybody, that's what I'm saying.

Q. Good, okay. And Mrs. Hayes has testified that she came back to your office and that she was having some difficulties and that you sold her some cream and you don't remember that?

A. Well, I heard her saying.

Q. Okay. And that didn't happen, right?

A. Didn't happen.

Q. Okay. Doctor, I want to show you—

MR. DONNELLY: Your Honor, could we have this marked for identification?

MR. ALLEN: Sure. Good idea.

THE COURT: That would be D–3. Can you describe what it is?

MR. ALLEN: It would be P. . . . Seventeen.

THE COURT: What is it?

MR. ALLEN: It's a check made out to Dr. Cha.

THE COURT: And who was the payor?

MR. ALLEN: Mary Hayes.

(T. 507:17–508:19). Whereupon counsel for the defendant requested a sidebar and the following colloquy ensued:

MR. DONNELLY: I've never seen or heard of this check before. And, in fact, the testimony I had yesterday from Mrs. Hayes was that she paid cash for these things, so I don't know where this check is coming from. It would have been real nice to produce it somewhere along the line so we can know about it.

THE COURT: Okay.

MR. ALLEN: Your Honor, this is impeachment. I never saw this page of the doctor's records, this payment page before in my life. This is proper impeachment at this time, certainly I have

no duty of disclosure, nor did I think I was going to use it.

MR. DONNELLY: Oh, come on.

THE COURT: What is it? Let's see.

MR. ALLEN: On October 6th he has no charge and we have a check dated October 6th.

THE COURT: For how much?

MR. ALLEN: $50.

THE COURT: And you didn't get this bill?

MR. ALLEN: I've not seen this before.

MR. DONNELLY: Judge, I thought everybody had this bill because every copy I've ever seen of this—

THE COURT: I'll permit it, I think it's—you opened the door on direct, I'll permit it on cross.

(T. 508:23–509:21).

■ The defendant does not contest that the information was offered as impeachment during the cross-examination of Dr. Cha. The defendant also does not argue either that the information was substantive in nature (although the court could conceive of such an argument) or that it was subject to a specific discovery request.[12] Rather, the defendant objects only that the information was not revealed by operation of the automatic disclosure rules. In this, the check presents a straight *Halbasch* ruling, and the admission falls within this court's adopted reading of the rule. As for surprise to the opposing party, the court does not doubt that the defendant was surprised. The plaintiffs do not contest that they had not disclosed the information to the defendant prior to trial. Moreover, the defendant

would not have likely remembered any such occurrence, having ceased his practice in the United States in 1996. The information was prejudicial in that it called into question Dr. Cha's records, a recurrent theme in the plaintiffs' case. But, the defendant had an opportunity to cure the prejudice through re-direct. Because reducing gamesmanship is a core aim of the new rule, the court finds that the last inquiry should carry significant weight. The court finds that plaintiffs' counsel did not engage in a bad faith or wilful dereliction of his duty to disclose information by withholding the check. At the sidebar, plaintiffs' counsel explained that he had not been aware of the October 6th payment card before seeing it at trial. Counsel further certified in connection with this motion that Dr. Cha's deposition transcript confirms that his billing records were not made available either prior to or during Dr. Cha's deposition. (*See* Pl.'s Br. at 21 n. 1). It was introduction of the payment card to refute the plaintiffs' position that Mrs. Hayes purchased creams that spurred the use of the check. The plaintiffs' counsel represented that prior to seeing the payment card, he had no intention of using the check. The court accepts this representation in the absence of any other information tending to refute it. Consequently, the court finds that the plaintiffs did not violate a rule or order of this court when they failed to disclose the check prior or to its use at trial for impeachment. As such, the court finds that there was no error under Rule 61.

### 2. The 1998 Sterilization Standards

■ The defendant asserts that admission of Autoclave sterilization standards

---

**12.** It is significant that the defendant did not base his objection on the plaintiffs' failure to provide the document in response to a properly served discovery request. Had that been the case, this court *may* have held differently, *see e.g. Varga v. Rockwell Intern. Corp.,* 242

F.3d 693 (6th Cir.2001), although the issue of whether the admission was so prejudicial that a refusal to grant a new trial would be "inconsistent with substantial justice" would not likely be found. Fed.R.Civ.P. 61.

promulgated in 1998 during the cross-examination of Dr. Cha was confusing to the jury and prejudicial to the defendant. In support of this proposition, the defendant refers the court to New Jersey case law and New Jersey Rule of Evidence 403. The defendant does not explain why state law would govern this evidentiary question. As discussed above, federal law governs this issue.

Federal Rule of Evidence 403 provides that evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The evidence complained of here consists of sterilization standards promulgated after the surgery. The following is the relevant trial colloquy, all elicited in the jury's presence:

Q. Now, Doctor, are you familiar with the sterilization standards that you were to maintain in your office to use that sterilizer?

A. Yes.

Q. Let me show you some part of some regulations, doctor. Can you see that? Does that indicate that there is to be—

MR. DONNELLY: Which are we referring to?

MR. ALLEN: This is from the steam sterilization standards, which I gave to you a long time ago.

MR. DONNELLY: Which ones?

MR. ALLEN: 7.4.3.1.

BY MR. ALLEN: Q. Does that regulation, Doctor, require that there is an external chemical indicator in the Autoclave every time you use it? Or don't you know?

A. Let me read it again.

Q. Sure. Doctor, how about if I give you a copy of it, to be fair.

MR. ALLEN: Can I have this marked, your Honor?

THE COURT: Sure.

MR. DONNELLY: Can I just see which one we're referring to?

THE COURT: Yes.

MR. DONNELLY: Thank you. Judge, I'm—excuse me, may I see that?

MR. ALLEN: Sure.

MR. DONNELLY: Judge, this is actually a 1998 standard. We're talking about 1995 here.

THE COURT: That's okay for cross-examination. You can bring it out on redirect. In other words, you are saying that this standard was—

MR. DONNELLY: I'm saying, first of all, even though Mr. Allen has said he gave this to me, I don't recall having seen it. But the other thing is I'm saying if you are going to cross-examine somebody with standards, let them be the standards that were prevalent in 1995.

THE COURT: Well, we'll clarify it. I'm sure you'll clarify that for the jury.

MR. ALLEN: Right now.

THE COURT: That was P–20, is that what that is?

MR. ALLEN: Yes. I think it's an exhibit in the pretrial order. It's listed. (Handing).

(T 575:8–576:25).

The plaintiffs offered the evidence to refute Dr. Cha's contention that he was following adequate sterilization standards. The court found at trial that the evidence was not unfairly prejudicial, particularly as the defendant could explain the import of the adoption date on redirect. That the official standards were not adopted at the time of the surgery is a matter of the

weight of the evidence. The relative probative value could be addressed during that redirect as well as in the defendant's expert testimony and at closing argument. Notably, the plaintiffs did not attempt to proffer the 1998 sterilization standards through one of their expert witnesses. Such an attempt would have shaped the court's discussion quite differently, as evidence coming from an expert at trial "can be 'both powerful and quite misleading because of the difficulty in evaluating it.'" *In re Orthopedic Bone Screw Products Liability Litigation,* 1997 WL 230818 (E.D.Pa.1997) (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

■■■■ The defendant offers in support of his position the Eleventh Circuit decision of *Benford v. Richards Medical Co.,* 792 F.2d 1537, 1539–40 (11th Cir. 1986). The defendant posits that in *Benford,* the trial court "found that the 1981 standard was irrelevant to claims that arose in the mid–1970's." (Def.'s Br. at 24). *Benford* is distinguishable from the instant case, and the facts actually support the court's decision in this case. In *Benford,* the trial court tentatively admitted the 1981 standards subject to the plaintiff proving its relevance later in trial. 792 F.2d at 1539. The trial court ultimately refused to allow the standard into evidence as it found that the relevance was not later proved. Here, the relevance has been conceded by the defendant, who has also argued that the information was cumulative to the plaintiffs' experts' earlier testimony. (*See* Def.'s Br. at 24–25). Moreover, the defendant's own expert specifically testified that the sterilization standard had not changed since the 1980's. (*See* Testimony of Dr. Burstin (T. 640)). Thus, admission of the sterilization standards did not confuse the jury, nor was its probative value outweighed by prejudice to the defendant.

The defendant finally suggests that the admission standards were unnecessary cumulative evidence admitted in violation of Rule 403's prohibition against such evidence. Even if the defendant is correct in his assertion that the evidence is merely cumulative, "[e]rroneous admission of cumulative evidence is harmless error." *Brown v. Cedar Rapids and Iowa City Ry. Co.,* 650 F.2d 159, 163 (8th Cir.1981) (admitting advisory standards not controlling on the defendant's conduct) (citing *Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 307 (5th Cir.1978) and 11 C. Wright & A. Miller, Federal Practice and Procedure § 2885 (1973)). And even if the standard was admitted in error, as the defendant had the opportunity to question his own witnesses about the appropriate standard at the time of the surgery, as well as to explain the applicability of the 1998 standard, the error was not "so prejudicial that a refusal to grant a new trial would be 'inconsistent with substantial justice.'" Fed.R.Civ.P. 61.

### 3. The *In Limine* Ruling

■■■ The defendant asserts that the court's favorable ruling on the defendant's motion to preclude reference to Dr. Cha's medical license suspension by the New Jersey Board of Medical Examiners improperly allowed the jury to speculate. Specifically, the defendant asserts that "[w]hile the court correctly precluded reference to that suspension, the court's remedy, i.e., prohibiting any explanation about the defendant's background, qualifications and his return to Korea in 1996, left the jury with an unexplained void" that the plaintiffs then allegedly exploited. The defendant cites no authority whatsoever for this position. In opposition, the plaintiffs maintain that the court was very sensitive to the potential prejudice that a license suspension could arouse, and, erring on the side of caution, narrowly construed

the doctrine of opening the door, again in Dr. Cha's favor. The court continues to find that it struck the appropriate balance with respect to the license suspension. The license suspension was highly probative because it directly concerned Dr. Cha's surgical practice and his alleged failure to follow standard procedures. It was similarly very relevant as it directly impacted the plaintiffs' contention that she continued to visit Dr. Cha into 1996. Indeed, Dr. Cha's inability to discuss that time period made it difficult even for the plaintiffs to elicit testimony about why he had decided to close his practice as well as the process of closing his practice. Indeed, even plaintiffs' counsel's statements made at closing argument regarding Dr. Cha's abrupt closing of his office and departure from the country did not have great impact as they lacked a prejudicial factual backbone. Though probative and relevant, the information was also highly prejudicial in that it involved the ultimate bad result, death of a patient. And admission of this evidence would have risked confusion of the issues and devolution into a mini-trial on the license suspension. The limiting instruction allowed the relevant and necessary facts to be revealed and developed without reference to the prejudicial information.

### 4. Summary

The alleged trial errors do not either singly or in combination affect the substantial rights of the parties, and no error or combination of errors was so prejudicial that a refusal to grant a new trial would be "inconsistent with substantial justice." Fed.R.Civ.P. 61.

### E. NEW TRIAL: PREJUDICIAL REMARKS DURING SUMMATION

The defendant maintains that counsel for the plaintiffs' comments at closing argument were "inflammatory in nature" so as to cause the jury to act out of bias and prejudice thus warranting a new trial. Specifically, the defendant objects to two lines of questioning: (1) reference to Mrs. Hayes's Blue Cross/Blue Shield medical records (see Def.'s Br. at 27–32); and (2) statements that the jury should "set the standard of care" (see Def.'s Br. at 32–33).

 The defendant refers the court to New Jersey law that, generally, comments by counsel in summation that have no bearing on the actual proofs will vitiate a jury verdict. (See Def.'s Br. at 27 (citing *Kulodzej v. Lehigh Valley Railroad Co.*, 39 N.J.Super. 268, 120 A.2d 763 (App.Div. 1956))). However, as with the other arguments for a new trial presented by the defendant, federal law shall govern. Thus, the "standard for ordering a new trial is that any such misrepresentations must have resulted in a trial that was unfair or substantial errors must have been made in allowing such misrepresentations to be recited to the jury." *Clopp v. Atlantic County*, 2002 WL 31242218 at *8 (D.N.J. 2002). To overturn a jury award because of counsel's improper statements during summation, the court must find that the "improper conduct by plaintiffs' trial counsel so pervaded the trial as to infect the jury's verdict." *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 206 (3d Cir.1992). The court shall address each in turn.

### 1. Reference to Mrs. Hayes's Blue Cross/Blue Shield medical records

 The defendant objected to the plaintiffs' use of Mrs. Hayes's Blue Cross/Blue Shield records to refute the defendant's early trial theory (later emphatically repudiated by defense counsel in his summation) that Mary Hayes had seen ten

dermatologists between 1995 and 1997. The court allowed testimony, over counsel's objection, and counsel does not renew his objection to the introduction of the evidence now. Rather, counsel objects to the inference that the plaintiffs suggested to the jury at closing as emanating from the records:

> Now, I marked in evidence, only to try to leave no unanswered question for you that you would worry about in reaching your decision, and I had Mrs. Hayes testify about it on the stand, that in addition to subpoenas, depositions, all those things, we gave, Mary Hayes gave authorizations to the defense for every doctor she ever saw in her life. And just to be sure, we've marked in evidence the authorization they gave for Blue Cross and Blue Shield, the only insurance company they've had, the only one that insures them for medical coverage through Mr. Hayes. And, you know, back in this time they're not thinking about being here today. And it's up to them, they could go through every record in her life, they know more about her than the IRS, and if they had something else, it would be here. There is no evidence of anything happening in this time frame of anyone touching her face other than getting antibiotics and the prescriptions from Dr. Cha, Dr. Farber and Dr. Glickman.

(T. 766:17–767:8). The defendant argues that this "conclusion" is improper because the defendant had requested information only from 1998 forward and thus did not "illuminate the care that occurred prior to 1997, the operative time period." (Def.'s Br. at 30). However, the court finds that the comments were proper inferences from the record facts. The defendant did not refute the plaintiffs' trial testimony that Blue Cross/Blue Shield was the plaintiffs' medical insurance as far back as the plaintiffs can remember, long before 1995, and

that Mrs. Hayes had signed a medical release authorizing the defendant to obtain all of her medical records on file with Blue Cross/Blue Shield. (*See* T. 427–429). That the defendant did not request the earlier records does not vitiate the plaintiffs' inference that the defendant had the ability to review all of the plaintiffs' records and found nothing. The court finds this a reasonable inference, particularly in light of the central character of the defendant's argument that Mrs. Hayes had seen ten dermatologists. *See Clopp,* 2002 WL 31242218 at *9 ("Plaintiffs' counsel is allowed during closing argument to make inferences based on admitted evidence").

### 2. Statements that the jury should "set the standard of care"

 The defendant further objects to counsel's statements that the jury should "set the standard of care":

> Folks, the standard of care that we've heard about all week long comes from those experts, but it's enforced here. If you want the standard of care to mean anything, it's got to come from your verdict.
>
> \* \* \*
>
> So set the standard of care. Make doctors do what they're supposed to do, in the only language, apparently, they understand.

(T 768:11–14; 770:4–6). The defendant argues that these comments encourage the jury to punish the defendant. (Def.'s Br. at 32). However, in the context of the summation as a whole, the comments merely remind the jury of its duty to "decide[ ] the specific standard of care— whether Defendant's conduct is below the general standard of care." *Hunley v. DuPont Automotive,* 174 F.Supp.2d 602, 607 (E.D.Mich.2001), *aff'd,* 341 F.3d 491 (6th Cir.2003); *see also Brown v. Cedar Rapids & Iowa City Ry. Co.,* 650 F.2d 159, 163

510

(8th Cir.1981) (collecting cases); Wright, Miller, & Kane, 10A Fed. Prac. & Proc. Civ.3d § 2729 ("Where reasonable persons could disagree, the jury determines the standard of care in accordance with the evidence presented at trial.").[13]

The court therefore finds that counsel for the plaintiffs committed no improprieties in his closing argument, and thus no unfairness or injustice resulted therefrom and the motion for a new trial shall be denied on this basis as well.

## F. NEW TRIAL ON DAMAGES FOR EXCESSIVE VERDICT OR A REMITTITUR

 The defendant seeks a new trial on damages, or in the alternative a remittitur, as the excessive verdict constitutes a miscarriage of justice. (Def.'s Br. at 33–40). As detailed above, federal law shall supply the standard for such a motion. Judge Bassler, in *Blakey v. Continental Airlines, Inc.*, 992 F.Supp. 731 (D.N.J.1998), fully and succinctly summarized the law of this Circuit on motions to vacate the jury award for excessiveness or to submit the verdict to remittitur, and this court shall not labor to improve it:

In reviewing a jury verdict, the court's "obligation is to uphold the jury's award, if there exists a reasonable basis to do so.... [A] court *may not* vacate or reduce the award merely because it would have granted a lesser amount of damages." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir.1989) (emphasis in original).... [O]n the issue of whether a damages award is excessive, this Circuit has on more than one

occasion instructed that the trial court "should be alert to its responsibility to see that jury awards do not extend beyond all reasonable bounds." *Walters v. Mintec/International*, 758 F.2d 73, 82 (3d Cir.1985); *Gumbs [v. Pueblo Int'l, Inc.]*, 823 F.2d [768,] 773 [(3d Cir.1987)]. The increased willingness of appellate courts to review damage awards "is a response to the increasingly outrageous amounts demanded by plaintiffs and awarded by juries." *Gumbs*, 823 F.2d at 773. If the verdict is a result of passion or prejudice by the jury, a new trial, rather than remittitur, is the appropriate remedy. *Dunn [v. HOVIC]*, 1 F.3d [1362] at 1383 [(3d Cir.1993)]. Damage awards that are merely excessive or so large as to appear contrary to reason, however, are subject to remittitur rather than a new trial. *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir.1992)....

Remittitur of the verdict is warranted where the jury verdict is clearly unsupported by the evidence and exceeds the amount needed to make the plaintiff whole[.] ... *Hurley v. Atlantic City Police Dept.*, 933 F.Supp. 396, 423 (D.N.J.1996). Courts have reduced jury awards when the damage award is so large as to seem improbable, even though it may still be possible. *Spence v. Board of Educ. of Christina School Dist.*, 806 F.2d 1198, 1201 (3d Cir.1986). It is the court's responsibility to "review a damage award to determine if it is rationally based" and to order remittitur where it is not. *[Williams v.] Martin*

---

13. The defendant makes some vague assertions that the plaintiffs may have attempted to bias the jury against the defendant because of his Korean ancestry. (*see* Def.'s Br. at 26, 32). The defendant does not fully argue this point or provide any explication of his position in this regard. The court does not find any

untoward reference to Dr. Cha or his ancestry. The comments related to Dr. Cha's return to Korea, in the context of the summation, merely highlight that the greatest impact of a jury verdict would be borne by the Hayes and not by Dr. Cha.

*Marietta [Alumina, Inc.]*, 817 F.2d [1030] at 1038 [(3d Cir.1987)]. The New Jersey Supreme Court has also acknowledged the utility of the procedure and has instructed its appellate and trial courts to use remittitur when faced with excessive verdicts because "it avoids the unnecessary expense and delay of a new trial." *Fritsche v. Westinghouse Elec. Corp.*, 55 N.J. 322, 331, 261 A.2d 657 (1970). In the Third Circuit, a remittitur should be granted to the maximum amount that a jury could have reasonably found. *Gumbs*, 823 F.2d at 772 (citing *Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033 (5th Cir. 1970)).

*Blakey*, 992 F.Supp. at 734–735.

The defendant contends that the $20 million verdict exhibits "an obvious intention to punish the defendant, Dr. Cha, rather than compensate plaintiff for her injuries." The defendant relies on his earlier arguments of error, combined with the alleged excessiveness of the verdict, in support of the motion for a new trial on all issues. The defendant does not otherwise expand upon his position. As the court has rejected the defendant's earlier arguments of error, the court shall not order a new trial on all issues based on the alleged excessiveness of the damages.

■ The court does find, however, that a new trial is merited on damages if the plaintiffs do not accept the proposed remittitur of $10 million for Mrs. Hayes and $1 million for Mr. Hayes. The combined $20 million award for pain and suffering was so great as to shock the conscience of the court. The plaintiffs, in opposition to the motion for a new damages trial or to remittitur detail the pain and suffering that Mrs. Hayes has experienced in the past eight years and the effect that her illness has had on Mr. Hayes. Much of that evidence appears above. Indeed, the court agrees that the evidence, the testimony, and Mrs. Hayes's condition at the time of trial, as detailed above, bespeak a travail of immense proportions for both Mrs. Hayes and Mr. Hayes over the past eight years and into the foreseeable future. Compensating such an extreme and debilitating injury is never easy and review of those awards is far from precise.

■ "The court may consider awards in other cases involving similar injuries as a 'helpful guide' to whether a particular damage award is excessive." *Blakey*, 992 F.Supp. at 736 (citing *Motter v. Everest & Jennings*, 883 F.2d 1223, 1230 (3d Cir. 1989)). The verdict in this case represents the second highest personal injury award in New Jersey in 2003, but it is by far the highest jury award for pain and suffering. *See* N.J. Law Journal, 9/20/04, at S–2. The number-one award in New Jersey was a $23.5 million dollar award for an automobile accident that killed a doctor and his mother-in-law. *See* N.J. Law Journal, 9/20/04, at S–1 (reporting on *Bastek v. Sabeil*, a case out of Bergen County). The majority of this award, however, $15.8 million, went to Dr. Bastek's estate for loss of income. The pain and suffering awards consisted of $3, $1.7, and $1.4 million awards to three of the family members. The next highest jury award after that in the instant case was for $6 million to a boy who lost his sight at four months due to malpractice. *See id.*, at S–3 (reporting on *Puzio v. Mimms*, a case out of Morris County). Of the $6 million, only $2.5 million was for pain and suffering. Also instructive is *Fertile v. St. Michael's Medical Center*, 169 N.J. 481, 779 A.2d 1078 (2001). There the New Jersey Supreme Court upheld a remittitur in a medical malpractice case arising from a child's injury at birth resulting in an atrophied and partially paralyzed arm. The jury awarded $15 million to the child and $3 million to

the mother for emotional distress, and the court remitted the amount to $5 million to the daughter and $250,000 to the mother. The court found the remittitur proper notwithstanding its recognition that the child's injury was "devastating and visible and with her for a lifetime." *Fertile,* 169 N.J. at 502, 779 A.2d 1078.

The members of the jury fulfilled their duty with dignity and with fairness to the best of their ability; they did not succumb to bias or prejudice as was argued above. Nevertheless, particularly in light of the experience of comparable cases, an award of $20 million seems "improbable" and the court shall grant remittitur or a new trial should the plaintiffs reject the remitted award.

### G. MOTION TO ALTER JUDGMENT AND AWARD PREJUDGMENT INTEREST

Federal Rule of Civil Procedure 59(e) provides for motions to amend or alter the judgment.[14] The plaintiffs have requested that the judgment in this case be amended to include prejudgment interest pursuant to New Jersey Court Rule 4:42–11(b). The defendant opposes an award of prejudgment interest under the New Jersey rule, asserting that 28 U.S.C. § 1961 governs the issue of interest in federal civil cases. The defendant argues in the alternative that even if the New Jersey prejudgment interest rule applies, application in this matter is improper as this case falls within that category of "exceptional cases" for which the "court may suspend the running of such prejudgment interest." R. 4:42–11(b).

 The defendant has asserted a potential *Erie* dilemma, as described above. Thus the court shall engage in the Rules

Enabling Act and *Erie*/Rules Decision Act analysis as set forth above.

First, the court shall ask whether there is a direct conflict between the two statutes such that a Rules Enabling Act analysis applies. 28 U.S.C. § 1961 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court .... calculated from the date of the entry of the judgment ..." New Jersey Court Rule 4:42–11(b) provides that in tort actions only, the court shall "include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest." Section 1961 provides for post-judgment interest; R. 4:42–11(b) provides for prejudgment interest. While section 1961 could be read broadly to encompass all possible interest recoverable in a claim, relevant jurisprudence counsels otherwise. First, the Third Circuit has long recognized the applicability of the New Jersey prejudgment interest rule to federal diversity cases. *See e.g. Salas by Salas v. Wang,* 846 F.2d 897, 909–910 (3d Cir.1988) (applying prejudgment interest rule to diversity case); *Jarvis v. Johnson,* 668 F.2d 740, 746–47 (3d Cir.1982). Second, the tenets of *Gasperini* and its *Erie* formulation require application of such a rule. *See Jarvis v. Johnson,* 668 F.2d 740, 746–47 (3d Cir.1982).

First, as far as a direct conflict is concerned, *S.A. Healy Co. v. Milwaukee Metropolitan Sewerage District,* 60 F.3d 305 (7th Cir.1995) (cited with approval in *Gasperini,* 518 U.S. at 428 n. 7, 116 S.Ct. 2211), is instructive. In *Healy,* Judge Posner considered similar provisions between

---

**14.** Fed.R.Civ.P. 59(e) provides: "Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment."

a Wisconsin statute and federal rule and found no direct conflict under the Rules Enabling Act. The relevant Wisconsin statutes provided that "if a plaintiff's settlement demand is rejected and the plaintiff goes on to win a judgment larger than the demand, he is entitled to twice his taxable costs plus interest at the rate of 12 percent from the date of the demand to the date when the judgment is paid." 60 F.3d at 307. The Federal Rule of Civil Procedure was purportedly at odds with this state statute. Describing Rule 68 as providing "that if a defendant makes a settlement offer which is rejected and the plaintiff wins a smaller amount at trial, the plaintiff shall be liable for the costs that were incurred after the making of the offer," Judge Posner found no REA conflict because the provisions are not in direct collision. *Healy*, 60 F.3d at 310. The Wisconsin statute "governs offers by plaintiffs" and Rule 68 "is limited to offers by defendants." *Id.* Thus, the provisions did not cover the same area. Similarly, section 1961 and R. 4:42–11(b) cover two different situations, the former post-judgment interest and the latter prejudgment interest. Neither has language excluding the other's remedy. Thus, they do not conflict.

Second, the *Erie*/Rules Decision Act analysis compels application of state law. As noted *supra*, *Erie* requires that courts apply state substantive law and federal procedural law. *See Gasperini*, 518 U.S. at 427, 116 S.Ct. 2211. The court thus must ask whether "application of the standard [would] have so important an effect upon the fortunes of one or both of the litigants that failure to apply it would unfairly discriminate against citizens of the forum State, or be likely to cause a plaintiff to choose the federal court?" *Gasperini*, 518 U.S. at 428, 116 S.Ct. 2211 (internal edits omitted). Again, both Third Circuit jurisprudence and *Healy* are instructive. *Healy* remarked that a "class of pretty

easy cases is where the state procedural rule, though undeniably 'procedural' in the ordinary sense of the term, is limited to a particular substantive area, such as ... tort law.... For then the state's intention to influence substantive outcomes is manifest and would be defeated by allowing parties to shift their litigation into federal court unless the state's rule was applied there as well." 60 F.3d at 310. New Jersey limited its court rule allowing for prejudgment interest to tort actions. *See* R. 4:42–11(b). Thus, the rule evinces substantive goals. *Healy*, 60 F.3d at 310; *see also Jarvis v. Johnson*, 668 F.2d 740, 745–47 (3d Cir.1982) (finding that Pennsylvania's similar local rule governs because it has a "clear and undeniable effect on the monetary outcome of a suit" in that it "results in increasing amount of damages a plaintiff can receive and a defendant must pay, over the amount of damages that would be awarded in the absence of the Rule.") In light of the above, failure to apply the rule would tend to defeat *Erie's* twin aims of "discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer*, 380 U.S. at 468, 85 S.Ct. 1136. Thus, the court shall apply New Jersey's prejudgment interest rule.

■ Application of New Jersey's prejudgment interest rule is automatic in verdicts awarding non-economic damages, unless the court finds that the case is among the "exceptional cases" warranting suspension of the running of such prejudgment interest. R. 4:42–11(b). As the verdict in the instant case is wholly for pain and suffering, a non-economic damage, the entire verdict is subject to prejudgment interest, unless the court finds that this case is among the exceptional cases warranting suspension. *See Mandile v. Clark Material Handling Co.*, 303 F.Supp.2d 531, 534–35 (D.N.J.2004) (citing Pressler, Current

N.J. Court Rules, Comment on R. 4:42–11(b)). The plaintiffs request prejudgment interest in the amount of $3,672,190. The plaintiffs assert that this case is not an exceptional case in one paragraph of a seven-paragraph certification in support of the motion to amend or alter the judgment. The plaintiffs argue that "this matter was tried in a relatively timely fashion and any delay may fairly be attributed in any event to defense requests to extend both discovery and trial date [and] defendant made no offer of settlement at any time prior to verdict." (Allen Cert., 12/12/03, ¶ 7).

▪▪▪ Just as the court remarked earlier that the defendant seemed to have lost sight of the plaintiffs' long and arduous path to identification, treatment, and preparation for trial in connection with their motion for a new trial, so too have the plaintiffs lost sight of that path in the instant motion. First, "[u]nder the New Jersey prejudgment interest rule, the 'judicial suspension of interest extends only to those cases where an award of interest would neither advance the aim of early settlement nor constitute fair compensation to plaintiff for money withheld and used or presumptively used by defendant.'" *Mandile*, 303 F.Supp.2d at 537 (citing *Dall'Ava v. H.W. Porter Co.*, 199 N.J.Super. 127, 130, 488 A.2d 1036 (App. Div.1985) (in turn citing *Kotzian v. Barr*, 152 N.J.Super. 561, 566, 378 A.2d 256 (App.Div.1977), *rev'd on other grounds*, 81 N.J. 360, 408 A.2d 131 (1979))). "The New Jersey Appellate Division has expressly rejected the idea that an 'exceptional case' must be due to some fault of the plaintiff. *See Dall'Ava*, 199 N.J.Super. at 130–31, 488 A.2d 1036. In fact, 'New Jersey courts have found exceptional circumstances where delays in the litigation have resulted not from the conduct of either party but because of a judicial delay ...'

*Electric Mobility Corp. v. Bourns Sensors/Controls, Inc.*, 87 F.Supp.2d 394, 403 (D.N.J.2000)." *Mandile*, 303 F.Supp.2d at 537. Finally, the rule should be applied to fairly reimburse the "plaintiff for monies withheld and used by defendant," but not where application would "have a punitive effect—a result not intended by the rule." *Dall'Ava*, 199 N.J.Super. at 131, 488 A.2d 1036.

In *Dall'Ava*, the court suspended the running of prejudgment interest during a four-month period of administrative termination occasioned by the bankruptcy of one of the defendants. 199 N.J.Super. at 131–32, 488 A.2d 1036. The court noted that in exercising its discretion under R. 4:42–11(b) to suspend the running of prejudgment interest, the following should be among the things considered:

"... there might be intervening appeals between institution of action and final judgment, inordinately protracting the interest payment period.... Must interest be nevertheless inexorably awarded the plaintiff for the entirety of the intervening period before final judgment without the tempering discretion of the judge? Or suppose the defendant tenders at the outset a settlement offer which the plaintiff unreasonably refuses....

\* \* \*

... But not all tort defendants are insured; many are insured for substantially less than the trial award; and many, who are not insured at all or are insufficiently insured, may be relatively impecunious.... In such instances the defendant may not have actually earned interest on the award during the intervening period, or on the total amount of the award, and allowance of prejudgment interest on the whole award could well operate oppressively or unfairly...."

*Dall'Ava*, 199 N.J.Super. at 130, 488 A.2d 1036 (citing *Busik v. Levine*, 63 N.J. 351, 383, 384, 307 A.2d 571 (1973) (Conford, J. dissenting) (a case decided prior R. 4:42–11(b)'s amendment adding the exceptional circumstances suspension of prejudgment, but suggesting that the rule should be amended to include such an exception)).

Turning to the instant case, this action was filed in March 2000, a full five years following the surgery that caused Mrs. Hayes's infection. The plaintiffs have requested prejudgment interest running from the filing of the complaint to the entry of the verdict and calculate that interest in the amount of $3,672,190. At the time the claim was filed, it is undisputed that the cause of Mrs. Hayes's injuries remained a mystery. Indeed, it was not until October 2001 that the plaintiffs identified the cause of the injury as a mycobacterium fortuitum infection. Prior to October 2001, the plaintiffs believed that Mrs. Hayes's injuries were due to a foreign body infection of unknown origin. (*See* Affidavit of Merit, filed pursuant to Order dated 2/6/01). The case proceeded to trial approximately two years following discovery of the mycobacterium fortuitum. Two years is a reasonable period for preparation and trial of a medical malpractice claim in this court. However, the court does not believe that the defendant should be charged with interest for that period of the case in which the plaintiffs, through no fault of their own, were unable to proceed with trial preparation in earnest. This pre-discovery period is analogous to a period of administrative termination, although the court did not order such. Consequently, the court finds that assessing interest for that period would be inequitable to the defendant.

The defendant contends that any prejudgment interest would be inequitable, as the plaintiffs were aware that Dr. Cha's insurance is capped at $1 million. As *Dall'Ava* observed, application of the rule to uninsured, underinsured, or impecunious defendants would "operate oppressively" and not comport with the concept of fairness at the heart of the prejudgment interest rule. *Dall'Ava*, 199 N.J.Super. at 130, 488 A.2d 1036 (citing *Busik v. Levine*, 63 N.J. 351, 383, 384, 307 A.2d 571 (1973)) (Conford, J. dissenting). The court finds this argument unavailing for two reasons. First, the defendant insurance company failed to make even an attempt to settle the dispute prior to trial. Indeed, prior to trial the plaintiffs offered to accept a settlement of $1 million (but did not make a Rule 68 offer of judgment), representing the policy limits. While Defendant Cha was willing to accept this offer, the insurance company declined the offer as well as the invitation of this court to engage in meaningful settlement discussions. The rejection of this offer confounded one of the purposes of the rule, to encourage settlement. *See Dall'Ava*, 199 N.J.Super. at 130, 488 A.2d 1036. Second, rejection of this offer by the insurance company presents a colorable argument that insurance is available for the entire verdict under the *Rova Farms Resort, Inc. v. Investors Ins. Co. of America* doctrine. *Rova*, 65 N.J. 474, 323 A.2d 495 (1974) ("where under the policy the insurer reserves full control of the settlement of claims against the insured, prohibiting him from effecting any compromise except at his own expense, that reservation—viewed in the light of the carrier's obligation to pay on behalf of the insured all sums up to the policy limit which he shall become obligated to pay—imposes upon the insurer the duty to exercise good faith in settling claims."). The court cannot find that the mandatory and automatic imposition of prejudgment interest interposed for the dual purpose of "early settlement" and "fair compensation to plaintiff for money withheld and used or

presumptively used by defendant," *Dall'Ava,* 199 N.J.Super. at 130, 488 A.2d 1036, meets the exceptional case bar under New Jersey jurisprudence.

Consequently, the court shall award prejudgment interest running from November 1, 2001 to the date on which the defendant pays the judgment to be calculated in accordance with the dictates of R. 4:42–11(b).

## IV. CONCLUSION

This court acknowledges that the size of the verdict in this case was immense and unusually so, yet equally immense was the suffering of the plaintiffs, occasioned, as the jury properly found, by the negligent conduct of the defendant, Dr. Cha. The jury, as the court earlier remarked, acted at all times with the kind of thoughtful professionalism and sincerity that honors the American system of justice. Notwithstanding the jury's calm and reasoned consideration, however, the court finds that the $20 million verdict is excessive because it is too disproportionate to verdicts in similar cases and it, indeed, shocked this court's conscience. The court thus orders a remittitur, setting the award at $10 million for Mrs. Hayes and $1 million for Mr. Hayes. The plaintiffs may either accept the remittitur or the court shall order a new trial on damages only. The court shall also amend the judgment to include prejudgment interest running from November 1, 2001 and calculated in accordance with the relevant New Jersey court rules. An appropriate order shall enter this date.

## ORDER

Presently before the court is the motion of Robert W. Donnelly, Jr., Esquire, counsel for the defendant, for a new trial and/or for remittitur pursuant to Fed. R.Civ.P. 59(a) (Doc. No. 81–1), upon the motion of Frank D. Allen, Esquire, counsel for the plaintiffs, to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e); and the court having considered the submissions of the parties, the trial testimony and exhibits; and for the reasons set forth in the court's opinion of this date;

IT IS this 29th day of September 2004 hereby

ORDERED that the defendant's motion for a new trial and/or for remittitur shall be *granted in part and denied in part;* and the court shall deny the defendant's motion for a net trial on all issues, and the court shall *grant* in part the motion for a new trial on damages, and a new trial on damages only shall be held unless the plaintiffs accept the remittitur of $10 million for Mrs. Hayes and $1 million for Mr. Hayes; and the plaintiffs shall inform the court and the defendant of their decision vis-a-vis the remittitur *no later than October 29, 2004* by filing a statement with the court and forwarding the statement to counsel for the defendant; and

IT IS FURTHER *ORDERED* that the plaintiffs' motion to alter or amend the judgment (Doc. No. 80–1), pursuant to Fed.R.Civ.P. 59(e), shall be *granted in part;* and the judgment shall be amended to include prejudgment interest in accordance with New Jersey Court Rule 4:42–11(b) running from November 1, 2001 and calculated in accordance with the relevant New Jersey court rules.